# IN THE COURT OF APPEALS OF IOWA

_____

No. 25-0376
Filed February 25, 2026

_____

**Farmers Feed & Grain Company, Inc.,**
Plaintiff/Counterclaim Defendant–Appellee,

v.

**Wayne Mlady,**
Defendant/Counterclaim Plaintiff–Appellant.

_____

Appeal from the Iowa District Court for Howard County,
The Honorable John J. Sullivan, Judge.

_____

**AFFIRMED**

_____

Erich D. Priebe (argued) and Chad A. Swanson of JSC Legal, P.L.C., Cedar
Falls, attorneys for appellant.

Ryan Stefani (argued) and Leslie Behaunek of Nyemaster Goode, P.C., Des
Moines, attorneys for appellee.

_____

Heard at oral argument
by Ahlers, P.J., Buller, J., and Doyle, S.J.
Opinion by Buller, J.

1

**BULLER, Judge.**

Following a bench trial, Wayne Mlady appeals the district court's inclusion of finance charges in the money judgment in Farmers Feed & Grain Company, Inc. (FFG)'s action to collect on an open account, as well as the denial of his counterclaim for breach of contract involving twelve credit-sale contracts. He challenges whether FFG was entitled to finance charges, whether the agreements were valid in light of Iowa Code chapter 203 (2021) or the Iowa Uniform Commercial Code (UCC) as applied to grain contracts, and whether FFG timely pled ratification as a defense. Because we find the finance charges were proper, the agreements were not invalidated by chapter 203, UCC principles apply, substantial evidence—including express credibility findings—supports the district court's ruling, and the timeliness challenge was waived, we affirm.

## BACKGROUND FACTS AND PROCEEDINGS

Mlady has farmed corn and soybeans in Howard County for more than fifty years. Relevant to this lawsuit, Mlady did business with FFG, a family-owned agricultural supply business that is headquartered in Riceville and owned in part by Stephen Eastman. Among other things, FFG sells crop inputs such as fertilizer, chemicals, and seed to local farmers. FFG also has a state-issued grain dealer license to buy and sell grain from producing farmers as a grain elevator, including by fixed-basis credit-sale contracts.

This case is about fixed-basis credit-sale contracts. The way these work is that upon delivery of grain, title passes from seller to grain dealer without fixing a price. Instead, the price is tied to the grain's commodity value in the Chicago Board of Trade's futures market, with a slight adjustment. A seller then has a defined period to elect a price. Generally, if the seller doesn't elect a price, the price defaults to the commodity's value at

the deadline and the grain dealer has a set period to pay the selling farmer. However, a seller can alternatively "roll" the contract forward, extending the deadline as a new contract. And sellers may seek cash advances up to a certain portion of these contracts.

The Iowa Department of Agriculture and Land Stewardship (IDALS) regulates these fixed-basis credit-sale transactions and audits grain dealers for compliance. *See* Iowa Code § 203.2; Iowa Admin. Code r. 21-91.13. Licensed grain dealers must maintain a debt-to-asset ratio of less than 85 percent to remain eligible to issue credit-sale contracts. And, among other requirements, IDALS requires the selling farmer to sign a new contract to roll a credit-sale contract forward.

Between 2009 and 2014, Mlady sold approximately 402,000 bushels of corn and 114,000 bushels of soybeans to FFG, as memorialized in twelve fixed-basis credit-sale contracts. Mlady had until February 28, 2014, to elect a price on the twelve contracts, but he didn't elect a price. So, the existing contracts were rolled into new contracts and continued to be rolled until February 28, 2020. In total, 398 credit-sale contracts would run between the parties.

The parties dispute the nature of their dealings. Mlady initially claimed that all the contracts were forgeries and none contained his authentic signature. But after his own handwriting expert suggested otherwise, Mlady eventually admitted he signed the first twelve contracts. He also admitted he never requested FFG to cash him out of the contracts. Instead, Mlady claimed to have an unwritten understanding with Eastman that the proceeds of the twelve contracts were to be treated as a pseudo-credit account from which he could obtain cash advances. And Mlady did in fact request and receive approximately $2.4 million in cash advances between 2011 and

2019—as much as $770,000 in a single year. He also admitted he received a tax benefit from not being cashed out. Mlady claimed that, despite having annual meetings with Eastman, he never received written statements on the status of his grain account. But he also admitted he never requested an overview of the account before 2020, and his first written request was made in October 2021.

In contrast, Eastman testified that Mlady told him that he didn't want to be cashed out and to instead roll the contracts. The district court expressly credited Eastman's testimony that Mlady said to "do what you need to do to keep it, keep the contracts in place." Eastman also testified that he and Mlady discussed the grain accounts sporadically over the years, at Mlady's request. According to Eastman, Mlady never expressed any concern about his account during the six years the contracts were rolling. And no contemporaneous communications between the parties cast doubt on Eastman's recollection.

In December 2019, IDALS suspended FFG's authorization to issue credit-sale contracts because FFG's debt-to-asset ratio was greater than 85 percent. Unable to roll Mlady's contracts any further, Eastman arranged a meeting with Mlady to discuss settling his account. Despite FFG attempting to settle the balance of the accounts, Mlady never cashed FFG's checks for the residual balance.

Outside of their credit-sale grain transactions, FFG would also regularly sell crop inputs to Mlady. FFG included language on its invoices providing that it would impose a finance charge for late payments. But, traditionally, FFG voluntarily declined to enforce the finance charges each fall after Mlady settled his account. Following the 2020 dispute over the grain contracts, Mlady refused to settle his crop-input account with FFG. Regarding the disputed crop-input account, Mlady testified that he didn't

recall receiving any mailed billing statements from FFG. In contrast, Eastman testified that it was FFG's business practice to send monthly invoice statements to customers like Mlady. And the court credited Eastman's testimony that he hand-delivered an invoice to Mlady on at least one occasion.

In December 2021, FFG sued to collect the balance of Mlady's outstanding crop-input account. Mlady answered and counterclaimed for breach of contract and unjust enrichment relating to the value of the grain account. In replying to Mlady's counterclaim, FFG only asserted the statute of limitations as an affirmative defense. FFG amended its petition twice, after which Mlady again reasserted his counterclaim in January 2023. Seven months later, FFG replied again, asserting several additional affirmative defenses, including that Mlady ratified FFG's conduct.

This matter was tried to the bench in the fall of 2024, and the court heard three days of testimony, including from Mlady and Eastman. The district court found FFG proved its claim under theories of collecting on an open account and unjust enrichment, and the court included the crop-input account's accrued finance charges in the money judgment. The court denied Mlady's counterclaim it in its entirety, finding "Mlady is not a credible witness, and his lack of credibility is fatal to his defense and counterclaim." Among other observations, the court noted Mlady "changed his story" after his claims of forgery were contradicted by his own expert handwriting witness. In its findings of fact, the court credited Eastman's testimony that Mlady instructed him to roll his credit-sale grain account, found Mlady's admission to signing the initial twelve contracts corroborated Eastman's version of events, and concluded that Mlady either verbally authorized or ratified FFG's rolling of the contracts. Mlady appeals.

## STANDARD OF REVIEW

Because the case was "tried at law, our review is for correction of errors at law." *Carroll Airport Comm'n v. Danner*, 927 N.W.2d 635, 642 (Iowa 2019). "The district court's findings of fact are binding on us if they are supported by substantial evidence." *Dolly Invs., LLC v. MMG Sioux City, LLC*, 984 N.W.2d 168, 173 (Iowa 2023) (cleaned up). "[B]ecause the district court had the opportunity to assess the credibility of the witnesses, we do give deference to those findings." *State v. Bower*, 725 N.W.2d 435, 440 (Iowa 2006) (citation omitted).

## DISCUSSION

Mlady challenges the district court's inclusion of finance charges in the money judgment and denial of his counterclaim. He first contests whether FFG provided sufficient evidence of notice on the finance charges and whether the parties' course of dealing waived FFG's ability to seek those charges. As to his counterclaim, Mlady argues that regulatory violations of chapter 203 invalidate any underlying agreement, the UCC does not apply, and he did not ratify rolling the contracts. He also argues FFG did not timely plead ratification as an affirmative defense. We consider each.

### I.     Finance Charges

First, Mlady argues FFG failed to prove it sent him notice of the finance charges before imposing them on the crop-input account, as required by Iowa Code section 535.11(1). He urges that FFG failed to provide evidence it mailed invoices with the required notice to Mlady. But Eastman confirmed the company mailed invoices containing the finance-charge notices as a standard practice. And the district court believed Eastman's testimony that he hand-delivered an invoice to Mlady on at least one occasion while trying

6

to resolve the parties' dispute. The district court was free to credit this testimony, and acceptance of that credibility finding ends our inquiry on this question. *See* Iowa R. App. P. 6.907 ("Findings of fact in jury-waived cases have the effect of a special verdict.").

Next, Mlady argues FFG's claim for finance charges fails for conflicting with the parties' course of dealing. *See* Iowa Code § 554.1303. Because FFG would regularly waive its imposed finance charges when he settled his account, Mlady argues he reasonably expected the same conduct in 2020. But Mlady admits he never settled his account in the fall 2020, which means Mlady is the party who deviated from the parties' course of dealing, and FFG was no longer bound by that course. There is also no dispute the finance charges were permissible under Iowa law. *See id.* § 535.11. So we affirm the district court's inclusion of finance charges in its determination of the amount owed to FFG.

## II.    Mlady's Counterclaim

Mlady challenges the district court's denial of his counterclaim for breach of contract. Mlady's challenge is multifaceted: he challenges the applicability of chapter 203 and the UCC to grain contracts, whether FFG properly pled ratification as an affirmative defense, and whether the facts support a finding of ratification. We take each in turn.

### A. Chapter 203

The basis of Mlady's breach-of-contract claim below and on appeal is that what he calls "common-law workarounds"—like verbal authorization and ratification—do not address the regulatory scheme for grain contracts

7

enacted by statute in chapter 203.[1] *See also* Iowa Admin. Code r. 21-91.11(7)(c) (implementing some provisions of chapter 203), *renumbered to* Iowa Admin. Code r. 21-91.9(7)(c) (2025). But there is a fundamental problem with Mlady's theory: he cites no authority, and we are aware of none, that establishes that a mere regulatory violation of code-chapter 203 or administrative-regulation-chapter 21 is a basis to invalidate private contracts like those between Mlady and FFG.

Chapter 203 is a relatively straightforward chapter establishing a regulatory framework for "grain dealers," as defined in section 203.1(10). It establishes a licensing scheme and provides clear remedies for violation of the statute: it authorizes IDALS to suspend, revoke, or cancel a license pursuant to section 203.10; it establishes that submission of certain false information is a "fraudulent practice"[2] and defines other criminal offenses pursuant to section 203.11(1), (2), and (3); it permits county attorneys or the attorney general to seek injunctions pursuant to section 203.11(4); and it permits enforcement of civil penalties pursuant to section 203.11A. *See generally* Iowa Code ch. 203. Notably absent from this list is any authority for IDALS or the courts to invalidate existing contracts between private parties for violation of the regulatory framework by a licensed grain dealer.

When pressed for authority supporting his claim at oral argument, counsel for Mlady pointed only to *Mincks Agri Center, Inc. v. Bell Farms, Inc.*, 611 N.W.2d 270, 278 (Iowa 2000). There, the supreme court held that sale

---

[1] At oral argument, counsel for FFG contended Mlady did not raise this argument until his reply brief, thus waiving it. *See* Iowa R. App. P. 6.903(4). We assume without deciding this claim was timely raised.

[2] Defining conduct as a "fraudulent practice" is a means to establish that conduct defined by civil or regulatory chapters is also a criminal act. Iowa Code § 714.8(10).

contracts with an unlicensed grain dealer were not enforceable based on the strong public policy justification for requiring a license, the grain dealer's deliberate misconduct, and the direct link between that conduct and the dealer's inability to pay the producer for the contracted grain. *See Mincks*, 611 N.W.2d at 278. This case is quite different. Mlady does not urge that FFG lacked a grain-dealer license when he sold the grain or FFG rolled the contracts; to the contrary, it appears FFG promptly contacted Mlady to cash out when it was no longer licensed and could no longer roll the contracts. In other words, no harm flowed to Mlady when FFG lost its license. The public policy concerns present in *Mincks*, *see id.* at 279–80, thus do not exist here, and we discern no basis on which we could transmute a regulatory violation (like the signature violations pressed by Mlady) into a basis for wholesale invalidating the agreements at issue. To conclude otherwise would be to grant Mlady a windfall when he suffered no injury, and that does not further the policy rationales underlying chapter 203. And, taken to its logical conclusion, his argument would require us to invalidate private contracts when they were printed with non-consecutive pagination, had a typo in the boilerplate, or used a disfavored font or type size. *See* Iowa Admin. Code r. 21-91.9(7)(a)(8) (2025), (b)(1), (b)(2). We are not persuaded this is consistent with the case law, legislative intent, or public policy.

## B. The UCC and Ratification

Having concluded that chapter 203 does not grant us authority to invalidate the agreements at issue, we must consider whether the agreements are otherwise valid. And the case law provides ample support for the proposition that grain contracts, although also separately regulated by other chapters of Iowa law, are also generally governed by the UCC. *See, e.g.*, *Bartlett Grain Co. v. Sheeder*, 829 N.W.2d 18, 23 (Iowa 2013) ("This case

involved the sale of grain, which is a good. Accordingly, the UCC governs.");
*St. Ansgar Mills, Inc. v. Streit*, 613 N.W.2d 289, 293–94 (Iowa 2000) (applying UCC statute of frauds in a dispute regarding the sale of corn); *S & S, Inc. v. Meyer*, 478 N.W.2d 857, 860 (Iowa Ct. App. 1991) ("Sales of grain, such as those in the present case, are governed by article 2 of the [UCC].").

The UCC recognizes that agreements may be ratified through conduct. Iowa Code § 554.2204(1) ("A contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract."). And this can be true even wholly absent a writing. *Id.* § 554.2207(3). "To ratify an act, the ratifier must either manifest assent that the act shall affect the person's legal relations, or engage in conduct that justifies a reasonable assumption that the person so consents." *GreatAm. Fin. Servs. Corp. v. Natalya Rodionova Med. Care, P.C.*, 956 N.W.2d 148, 154 (Iowa 2021) (cleaned up). "As a generality, manifestation of assent, and whether certain conduct is sufficient to indicate consent, are questions of fact." *Id.*

Here, we have the benefit of detailed fact-findings by the district court, including express credibility findings. Fatal to Mlady's attempt to recast the facts on appeal, the district court repeatedly found his theory of the case unpersuasive generally and his testimony uncredible specifically. We conclude substantial evidence—including Eastman's testimony, which the district court credited—supports the finding that Mlady's statements and conduct were sufficient to ratify or otherwise authorize FFG continuing to roll the contracts. And to the extent there is contrary evidence in the record, such as from Mlady's testimony, we discern no basis on which to disturb the district court's express credibility findings.

10

### C. Timeliness of Ratification Defense

Last, Mlady claims that FFG failed to timely plead ratification as an affirmative defense—thereby waiving it—under Iowa Rule of Civil Procedure 1.421(1). But Mlady did not raise this issue on appeal until his reply brief, which comes too late for us to consider it. Iowa R. App. P. 6.903(4) ("Issues may not be asserted for the first time in the reply brief."); *Blomgren v. City of Ottumwa*, 227 N.W. 823, 824 (Iowa 1929) ("The errors relied upon for reversal set out in appellant's original brief measure its full right of review."). We do not consider this issue any further.

**AFFIRMED**.