914 A.2d 168

**Linda B. KRETER**

v.

**HEALTHSTAR COMMUNICATIONS, INC.**

**No. 1849, Sept. Term, 2005.**

Court of Special Appeals of Maryland.

Jan. 2, 2007.

244

Joel A. Dewey, Baltimore (Cynthia Young, on brief, Annapolis), for appellant.

Rignal W. Baldwin (Jonathan P. Kagan, Brassel Baldwin Kagan & May, PA, on brief), Annapolis, for appellee.

Panel SALMON, ADKINS and WOODWARD, JJ.

ADKINS, J.

In this case, we examine the limits of the Maryland common law rule restraining courts from interpreting an indemnification agreement, even a broadly worded one, to cover negligence of the indemnitee, without explicit language unequivocally showing such intent. *See Heat and Power Corp. v. Air Prods. & Chems., Inc.*, 320 Md. 584, 602, 578 A.2d 1202 (1990). We shall refer to this common law rule as the "Presumption Against Indemnification For Negligence," or simply, the "Presumption."

In connection with a stock sale and termination of an executive employment contract, Linda B. Kreter, appellant, entered into a written agreement to indemnify HealthSTAR Communications, Inc. (HealthSTAR), appellee, from all claims brought against HealthSTAR by her former husband. Relying on the Presumption, she argues that, because her agreement to indemnify HealthSTAR would not cover HealthSTAR's own negligence, that it obviously did not cover HealthSTAR's fraud. She asks us to review the Circuit Court for Anne Arundel County's declaratory judgment adverse to her position. Because we do not interpret the Presumption Against Indemnification For Negligence as broadly as does appellant, we affirm the circuit court's decision.

## FACTS AND LEGAL PROCEEDINGS

Appellant, Linda B. Kreter, married Charles R. Kreter in 1978.[1] During their marriage, they founded two companies

---

1. For clarity and ease, we shall sometimes refer to Linda Kreter and Charles Kreter by their first names.

for the purpose of providing patient recruitment, enrollment, and other support services for pharmaceutical trials. The two companies also provided marketing service applications for the pharmaceutical industry. The first company, Pharmaceutical Research Consulting, Inc. ("PRC"), was founded on April 27, 1994. The second company, Pharmaceutical Research Plus("PRP"), was founded on November 15, 1995. When these two companies were formed, Linda Kreter owned 52% of the stock and Charles owned 48% of the stock. The stock ownership of these two companies was eventually adjusted so that Linda owned 55%, Charles owned 35% and other minority stockholders owned 10%.

Linda and Charles separated on March 1, 1999. On December 6, 1999, Charles was fired from his position as Chief Financial Officer of the companies. Linda remained the majority and controlling shareholder and the Chief Executive Officer of both companies.

In July 2000, Linda began negotiations with HealthSTAR regarding the purchase of all stock of PRP and PRC. On November 17, 2000, Charles was informed of the proposed sale to HealthSTAR. At shareholder meetings in December 2000, Linda presented identical letters of intent from HealthSTAR to purchase the stock of PRP and PRC, with one letter addressed to Charles and the other to Linda. The letters stated that the purchase price for each share of the stock would be identical for each shareholder. Then Linda, Charles and the minority shareholders agreed to sell 100% of the stock to HealthSTAR and signed letters of their intent to convey.

Under the conditions of this sale to HealthSTAR, Linda was required to continue as the president of PRP. Because of this condition, Linda and HealthSTAR were engaged in employment contract negotiations at the same time the stock purchase discussions were occurring.

Before closing on the sale of the stock, HealthSTAR agreed to pay Linda an additional $1 million of consideration. This arrangement was not disclosed to Charles. On June 18, 2001, HealthSTAR purchased 100 percent of the PRP and PRC

stock. On July 24, 2001, Linda and Charles were divorced by Judgment of Absolute Divorce.

Even though the sale of stock was complete, the terms of Linda's employment contract with HealthSTAR remained unsettled. In support of her Memorandum in Opposition to HealthSTAR's Motion for Summary Judgment, Linda stated under oath that she "understood she had reached an agreement in principle with HealthSTAR on the terms of her contemplated employment, [but] that agreement had not been reduced to a satisfactory writing." She further stated that HealthSTAR insisted that she sign the signature pages of an employment agreement, when the terms of same were not completely set forth, or "the entire transaction would collapse."

After closing on the stock sale, Linda and HealthSTAR continued to disagree on the terms of her employment, and on May 14, 2002, Linda filed suit against HealthSTAR. That action was resolved with a settlement agreement, effective November 15, 2002, which memorialized the termination of Linda's business relationship with HealthSTAR. This settlement agreement contained an indemnification clause which provided:

11. *Indemnification of HealthSTAR Parties for Charles Kreter claims*

(a) *Indemnification.* [Linda] Kreter shall indemnify and hold the HealthSTAR parties harmless from and against any claim, loss, damage, judgment or expense (including but not limited to reasonable attorney's fees and costs)arising out of or related to claims by or on behalf of Charlie Kreter related to: (i) remuneration in cash or stock that was paid or payable to Kreter as a result of or under the Stock Purchase Agreement, the Employment Agreement or the Incentive Compensation Agreement; or (ii) the manner in which the June 2001 transaction between HealthSTAR and Kreter was structured including but not limited to any matters concerning or related to the incentive compensation payable to Kreter as referred to in the Employment Agree-

ment or the Incentive Compensation Agreement or (iii) monies paid to Kreter by PRP or PRC prior to June 18, 2001, (collectively or separately the following are hereinafter referred to as the "Charlie Kreter claims").

(b) *Defense of Charlie Kreter Claims.* At HealthSTAR's election, Kreter shall defend the HealthSTAR parties from and against any of the Charlie Kreter Claims. If HealthSTAR elects for Kreter to defend the HealthSTAR Parties from and against the Charlie Kreter Claims, Kreter shall provide a defense to the HealthSTAR parties with counsel selected by Kreter, at her sole cost and expense. The HealthSTAR parties shall, at their sole cost and expense, have the right to defend their interests in any litigation or arbitration instituted by Charlie Kreter. If Kreter accepts the tender of the defense at HealthSTAR's request, the HealthSTAR parties shall have the right to have their counsel present as co-counsel in any such defense, at HealthSTAR's sole cost and expense.

On May 15, 2003, Charles filed suit against HealthSTAR, PRP, PRC, and Linda. His suit included allegations that Linda, PRP, and PRC wrongfully paid Linda a substantial bonus and director fees in December of 2000. He also claimed HealthSTAR and Linda defrauded him and conspired to defraud him in HealthSTAR's purchase of the PRP and PRC stock. Finally, Charles argued that Linda had breached the escrow agreement that PRP and PRC shareholders had made with HealthSTAR at the time of the sale. In an amendment, Charles added a shareholder's derivative action against Linda, PRP, and PRC regarding employee bonuses and director fee payments in 2000. He also added a claim that HealthSTAR had aided and abetted Linda in defrauding him.

When Charles served his original complaint, HealthSTAR asked Linda to provide a defense against all of his claims except the escrow claim, pursuant to the indemnification section in their settlement agreement. Linda engaged the firm of Brassel and Baldwin, P.A. to defend HealthSTAR, PRP, and PRC, and has paid all of that firm's charges, pursuant to the settlement agreement.

The Circuit Court for Anne Arundel County dismissed all of Charles' claims against Linda, PRP, and PRC. In granting Linda's motion to dismiss, the court determined that any fraud she committed was intrinsic to the divorce, and therefore his claims were barred by *res judicata*. As additional grounds for Linda's dismissal, the court found that Charles released his rights to Linda's property by signing the divorce agreement.

The only remaining claim in Charles's litigation was his allegation of fraud against HealthSTAR. On August 20, 2004, Linda sent HealthSTAR a letter reserving her right to contest her obligation to indemnify HealthSTAR, notwithstanding her continuing payment of Brassel and Baldwin, P.A. HealthSTAR responded by claiming Linda could not assert such a reservation of rights. HealthSTAR also filed a complaint for declaratory judgment against Linda regarding her obligation to indemnify it for Charles' claim. HealthSTAR moved for summary judgment.

Linda filed a counter-complaint for declaratory judgment, stating she was not required to indemnify HealthSTAR in the Charles Kreter litigation, and she then filed a cross-motion for summary judgment on July 26, 2005. HealthSTAR filed an answer and moved for summary judgment on the counter-complaint.

The circuit court issued an oral opinion and verdict from the bench in the underlying Charles Kreter litigation on April 21, 2005. It found the $1,000,000 signing bonus was consideration for Linda's decision to move forward with the sale. Also, the circuit court found that Linda deliberately induced Charles to go forward with the settlement agreement in the divorce and the corporate sale simultaneously, to prevent Charles from having access to any assets she acquired in the sales transaction. Additionally, it found that Linda told HealthSTAR about the divorce litigation, and that HealthSTAR agreed with her to conceal from Charles any information about the $1,000,000 signing bonus. The court concluded it "would be fair, reasonable and appropriate compensation to award Mr.

Kreter 35 percent of the million dollar sign on bonus which clearly was marital property."

On September 15, 2005, the circuit court issued a declaratory judgment in this case, holding that Linda was liable to HealthSTAR for the judgment entered against it and reasonable attorney's fees for its defense in the Charles Kreter litigation. The court granted HealthSTAR's motions for summary judgment, finding that Maryland law does not prohibit an explicit agreement for indemnification between joint tortfeasors. The court also held that both parties understood the nature of the claims that Charles might assert, and their settlement agreement contemplated its application to a claim such as Charles' fraud claim. Linda entered her appeal in this case, in which she asks us to consider the following question:

> Is an indemnitee entitled to indemnification for the indemnitee's own fraudulent acts, in the absence of specific language in the controlling contract?

## DISCUSSION

### Standard Of Review

In reviewing a circuit court's grant of summary judgment in favor of HealthSTAR, we must determine if the trial court was legally correct. *See Heat & Power Corp. v. Air Prods. & Chems., Inc.*, 320 Md. 584, 591, 578 A.2d 1202 (1990). Summary judgment is proper when there are no genuine disputes of material fact and the moving party is entitled to judgment as a matter of law. *See* Md. Rule 2–501. Interpretation of the settlement agreement is a question of law for this court to decide using the language of the contract. *See Auction & Estate Representatives, Inc., v. Ashton*, 354 Md. 333, 341, 731 A.2d 441 (1999).

### Interpretation Of The Contract

When determining if the settlement agreement requires Linda Kreter to indemnify HealthSTAR, we first recognize that Maryland follows the law of objective interpretation of contracts. *See Auction & Estate Representatives*, 354 Md.

at 340, 731 A.2d 441. The clear and unambiguous language of a contract will prevail over what the parties thought the agreement meant. *See id.* While both maintain this indemnity provision is unambiguous, Linda and HealthSTAR disagree as to what that meaning is.

When a reasonably prudent person interprets a contract's language and discovers multiple meanings, an ambiguity then arises. *See Calomiris v. Woods,* 353 Md. 425, 436, 727 A.2d 358 (1999). In determining whether a reasonable person could assign more than one meaning to the words of a contract, this Court is permitted to consider the purpose of the contract, its character, and the facts and circumstances of the parties at the time of execution. *See Mamsi Life & Health Ins. Co. v. Callaway,* 375 Md. 261, 279, 825 A.2d 995 (2003); *Heat & Power Corp. v. Air Prod. & Chemicals, Inc.,* 320 Md. 584, 596, 578 A.2d 1202 (1990); *Pac. Indem. Co. v. Interstate Fire & Cas. Co.,* 302 Md. 383, 388, 488 A.2d 486 (1985).

Before closing the stock sale to HealthSTAR, Linda was paid an additional $1 million in consideration, and Charles was not informed that this incentive was given. At this time, Linda and Charles were not yet divorced. After the extra $1 million was paid, HealthSTAR and Linda finalized the terms of her employment with the companies, and after the stock transfer, the parties had disputes about the employment terms. After Linda filed a lawsuit to work out these issues, the parties entered a settlement agreement on November 15, 2002. As part of that settlement, Linda agreed to indemnify HealthSTAR against claims from Charles.

It is clear from viewing the settlement agreement in its entirety that Linda and HealthSTAR thought specifically about which type of claim Charles could bring against each of them, and allocated the risks as they saw fit. In Section 8(d) of the settlement agreement, HealthSTAR indemnifies Linda if Charles brings claims against Kreter "related to actions taken by Price Waterhouse Coopers ... concerning the escrow under the 2001 Escrow Agreement." Section 11 of the

agreement sets forth the type of claim by Charles that it was intended to cover:

[Linda] Kreter shall indemnify and hold the HealthSTAR Parties harmless from and against any claim, loss, damage, judgment or expense including but not limited to reasonable attorneys fees and costs arising out of or related to claims by or on behalf of Charlie Kreter related to: (i) **remuneration in cash or stock that was paid or payable to Kreter as a result of or under the Stock Purchase Agreement, the Employment Agreement or the Incentive Compensation Agreement; or (ii) the manner in which the June 2001 transaction between HealthSTAR and Kreter was structured including but not limited to any matters concerning or related to the incentive compensation payable to Kreter** as referred to in the Employment Agreement or the Incentive Compensation Agreement or (iii) monies paid to Kreter by PRP or PRC prior to June 18, 2001. (collectively or separately the following are hereinafter referred to as the "Charlie Kreter claims").

Linda makes three arguments in support of her contention that she is not obligated to indemnify HealthSTAR, which we address in the next three sections of this opinion.

### The Presumption Against Indemnity For Negligence

Relying on the Presumption Against Indemnification For Negligence, Linda contends that the circuit court was required to conclude that, although she agreed broadly to indemnify HealthSTAR against "any claim, loss, damage, judgment or expense" related to the Stock Purchase agreement or Incentive Compensation Agreement or "the manner in which the June 2001 transaction ... was structured," she was not liable for the judgment entered against HealthSTAR. *See Heat & Power Corp.*, 320 Md. at 593, 578 A.2d 1202; *Crockett v. Crothers*, 264 Md. 222, 285 A.2d 612 (1972).

Linda argues that the rule should apply with equal force to indemnification against fraud. We assume, for purposes of this discussion, that the Presumption, if applicable in the first place, would apply equally in cases of fraud. To decide

whether the Presumption applies in this case, we first examine the rationale underlying the Presumption.

In *Heat & Power Corp.*, a contractor and owner entered into a contract that included a broad indemnification of the owner by the contractor, and thereafter the owner's sole negligence caused an injury to the contractor's employee. *See Heat & Power Corp.*, 320 Md. at 588, 578 A.2d 1202. The Maryland Court of Appeals held that the indemnity provision in the contract did not apply, because the intent of the parties to indemnify the owner against his own negligence was not "expressed in those very words or in other unequivocal terms." *Id.* at 593, 578 A.2d 1202 (citation omitted).

The *Heat & Power* Court relied on *Crockett*, which stated the "general rule" in interpreting an indemnification agreement between a contractor and engineer when the engineer, the indemnitee, was solely negligent: "The general rule is that contracts will not be construed to indemnify a person against his own negligence unless an intention so to do is expressed in those very words or in other unequivocal terms." *Crockett*, 264 Md. at 227, 285 A.2d 612 (citations omitted).[2] Linda Kreter argues that her indemnification agreement should fall under the Presumption of *Crockett* and *Heat & Power*.

Both Maryland appellate courts, and those of other jurisdictions following the Presumption, have been somewhat parsimonious in their explanations for its existence. Our Court of Appeals has explained the Presumption simply on the ground that "one of the reasons why contracts to indemnify must be expressed in unequivocal terms is to protect the unwary and uninformed promisor." *Heat & Power*, 320 Md. at 596, 578 A.2d 1202.[3] The *Heat & Power* Court relied on *Crockett*,

---

2. In *Crockett*, the contract specifically said "the obligations of the CONTRACTOR ... *shall not extend* to the liability of the ENGINEER[.]" *Crockett*, 264 Md. at 227, 285 A.2d 612.

3. The *Heat & Power* Court, however, declined to extend the "unwary and uninformed" rationale to a liability insurance contract, because "a liability insurer is rarely an unwary or uninformed promisor." *Heat & Power*, 320 Md. at 596, 578 A.2d 1202.

which is the earliest recognition of the Presumption in Maryland.[4] *See also Adloo v. H.T. Brown Real Estate, Inc.,* 344 Md. 254, 261–62, 686 A.2d 298 (1996)(relying on *Crockett* as precedent for the rule).

We have traced the history of the Presumption from *Crockett* back to 1874, looking for the underpinnings of the rule.[5] In examining this history, we learn that Maryland's Presumption originated from New York common law. *See Magnin v. Dinsmore,* 56 N.Y. 168, 170 (1874).[6]

The New York Court of Appeals in *Magnin*, focusing largely on the respective negotiating power of the parties, applied the Presumption to support its decision to narrowly construe a broadly worded indemnification agreement made by a shipper of goods for the benefit of a common carrier. *See id.* at 172. It reasoned that when the damage was caused by the negligence of the indemnitee, the indemnification clause should be construed "most strongly against the party whose language [limited the indemnitee's liability], and whose situation places him, at least, in a position of equal advantage in fixing the terms of the contract." *Id.* at 174. Accordingly, although the indemnification contract covered any "loss or damage arising from the dangers of railroad, ocean, stream, or river naviga-

---

**4.** No cases following *Heat & Power* offered any fuller explanation of the reason for the presumption. *See Mass Transit Admin. v. CSX Transp., Inc.,* 349 Md. 299, 307, 708 A.2d 298 (1998).

**5.** The intervening cases cited by Maryland courts to support the Presumption were *Blockston v. United States,* 278 F.Supp. 576, 591 (D.Md. 1968); *Farrell Lines, Inc. v. Devlin,* 211 Md. 404, 421–22, 127 A.2d 640 (1956); *Sinclair Prairie Oil Co. v. Thornley,* 127 F.2d 128, 133 (10th Cir.1942); *Doughnut Mach. Corp. v. Bibbey,* 65 F.2d 634, 636–37 (1st Cir.1933); *Jennings v. Grand Trunk Ry. Co.,* 127 N.Y. 438, 28 N.E. 394, 397 (1891). These cases articulated the Presumption without examination of its rationale.

**6.** Magnin relied on several earlier New York cases, which recognized the Presumption without explanation of its rationale. *See Lamb v. Camden & A.R.R.,* 46 N.Y. 271, 278 (1871); *Steinweg v. Erie Railway,* 43 N.Y. 123, 126 (1870); *Guillaume v. Hamburgh & A. Packet Co.,* 42 N.Y. 212, 214 (1870).

tion[,]" the court excluded from coverage all damages caused by the common carrier's negligence:

> The terms of these contracts are very much under the control of the carriers, and they may justly be required to express in plain terms the entire exemption for which they stipulate. The language of this clause is very broad; but if it be desired that a clause shall cover losses by negligence, it is not too much to say that the purpose must be clearly expressed.

*Id.* at 172, 174.

Interestingly, in 1971, the New York Court of Appeals overruled the New York Presumption. *See Levine v. Shell Oil Co.*, 28 N.Y.2d 205, 211–213, 321 N.Y.S.2d 81, 269 N.E.2d 799 (N.Y.1971). We mention this not because we intend to follow New York's abolishment of the Presumption, but because the New York court, reflecting upon its earlier decisions, suggested that another reason for the development of the Presumption was the courts' fear of encouraging negligent conduct by the indemnitee. The New York Court of Appeals explained:

> Indemnification clauses have traditionally plagued both drafters and courts alike. Since one who is actively negligent has no right to indemnification unless he can point to a contractual provision granting him that right, a rule has evolved under which courts have carefully scrutinized these agreements for an expression of an intent to indemnify and for some indication of the scope of that indemnification. Thus we have said that "contracts will not be construed to indemnify a person against his own [active] negligence unless such intention is expressed in unequivocal terms[.]" **This rule appears to be premised upon the view that where a person is under no legal duty to indemnify, his contract assuming that obligation must be strictly construed.** Although we have no conceptual difficulty with such a rationale, we do question the judicial feasibility of a rule which allows a court to conclude that where a contract provides that indemnification will be for any and all liability, the parties must have meant something else. **Thus courts—perhaps concerned with the notion that indem-**

nification against active negligence leads to negligence by the indemnitee-have often searched for some specific reference to active negligence in the agreement[.]

*Id.* at 211, 321 N.Y.S.2d 81, 269 N.E.2d 799 (emphasis added and citations omitted).[7]

In explaining its abandonment of the Presumption, the New York Court of Appeals also expressed concern that, in some instances, the Presumption would operate to nullify the plain objective meaning of the contract language:

Courts should be wary of construing these [indemnification] provisions in such a manner that they become absolutely meaningless. Therefore, indemnification has been permitted under contractual provisions though the language of those provisions fell short of expressly stating that its coverage extended to the active negligence of the party to be indemnified where, as here, that appears to have been the unmistakable intent of the parties. . . . The clause, in the instant case, clearly states that Visconti will be required to indemnify Shell against all claims, suits, loss, cost and liability. Since the plain meaning of these words fairly includes the liability for the active negligence of Shell, we see no reason why more should be required to establish the unmistakable intent of the parties. A contrary construction would result in the conclusion that the clause was a nullity. Surely, this could not have been the intent of the parties.

---

7. Other courts have given similar, but not identical, rationales. An Alabama court allowed one party to indemnify the other for its negligent acts, if the agreement was clear and "if the parties knowingly, evenhandedly, and for valid consideration, intelligently entered into [the] agreement." *Royal Ins. Co. of Am. v. Whitaker Contracting Corp.*, 824 So.2d 747, 753 (Ala.2002) (citation omitted). In addition, courts have looked to the equal bargaining power of the parties when considering the validity of indemnification agreements covering sole negligence of the indemnitee. *See Shell Oil Co. v. Brinkerhoff–Signal Drilling Co.* 658 P.2d 1187, 1189 (Utah 1983); *Morton Thiokol, Inc. v. Metal Bldg. Alteration Co.*, 193 Cal.App.3d 1025, 1031, 238 Cal.Rptr. 722 (Cal.App.1987)(contractor's president inspected the roof before signing and therefore must have been aware of the exact hazards at issue).

*Id.* at 212–213, 321 N.Y.S.2d 81, 269 N.E.2d 799 (citations omitted).

▆▆ It is not our role to overrule settled precedent of the Maryland Court of Appeals, and therefore, as we indicated, we will not consider abandonment of the Presumption based on the New York court's decision. Moreover, we see wisdom in the thought that indemnification against the indemnitee's own future negligence might encourage negligent conduct. Yet, like the New York Court of Appeals, we are reluctant to utilize the Presumption in a context that operates to belie the parties' actual intent, particularly when doing so extends the Presumption beyond the existing precedent. In this case, we hold the Presumption inapplicable because this indemnification agreement differs significantly from the circumstances in which Maryland has previously applied it.[8] We explain.

The *Crockett* and *Heat & Power* cases involved ongoing business relations in which the indemnitee contracted to provide a future service to the indemnitor. *See Heat & Power,* 320 Md. at 588, 578 A.2d 1202; *Crockett,* 264 Md. at 228, 285 A.2d 612. In contrast, HealthSTAR's agreement with Linda was not part of an ongoing contractual relationship in which liability could arise in the course of future contract performance. Instead, the indemnification agreement here was part of a contract that *extinguished* the relationship between Linda and HealthSTAR, and addressed liability for actions that had *already* taken place. This distinction is key.

The matters explicitly included in the indemnification clause were claims "arising out of or related to" amounts "paid or payable to [Linda] as a result of or under the Stock Purchase

---

**8.** The Court of Appeals has recognized that there are exceptions to the general rule that provisions to indemnify against a party's sole negligence must be clear and unequivocal. See *Mass Transit Admin. v. CSX Transp., Inc.,* 349 Md. 299, 309–11, 708 A.2d 298 (1998). In *MTA,* the Court of Appeals interpreted an indemnification provision between the State and a railroad corporation. The Court held that the State's promise to indemnify included liability for the sole negligence of the railroad corporation because the State's indemnification was in the nature of insurance. *See id.* at 311, 708 A.2d 298.

Agreement, the Employment Agreement or the Incentive Compensation Agreement" or "the manner in which the June 2001 transaction ... was structured." Although we have not found the Employment Agreement or the Incentive Compensation Agreement in the record, it is obvious that the $1 million payment that was the cornerstone of Charles' lawsuit, was paid in the past and pursuant to one of these agreements. For this reason, applying the Presumption here would not serve to protect against *future* negligence spawned by the lack of any financial incentive to meet standards of due care.

Nor does enforcement of this indemnification run the risk of undue damage to an "unwary or uninformed" indemnitor. *See Heat & Power*, 320 Md. at 596, 578 A.2d 1202. The events referred to in the settlement agreement—the three agreements with Linda—were obviously matters within her knowledge. And, other than the settlement agreement itself, and the 2001 Escrow Agreement,[9] HealthSTAR had no ongoing contractual relationship with Linda or Charles. Thus, there would be no basis for the accrual of any unexpected causes of action by Charles.

Charles' injuries from these past events are the gravamen of his fraud claim against HealthSTAR. The fraud that the court found in the Charles Kreter litigation, which formed the basis for its damage award, was HealthSTAR's collaborating with Linda to conceal the $1 million extra payment to Linda as inducement to enter the Stock Purchase Agreement. Thus, Charles's claim, against which HealthSTAR seeks indemnification, also fell within the language of the indemnification clause as a claim based on "the manner in which the June 2001 transaction between HealthSTAR and Linda was structured." Charles claimed that HealthSTAR defrauded him by paying Linda "compensation" that, in reality, was consideration for the stock sale.

---

**9.** In the settlement agreement, HealthSTAR indemnified Linda against any claims by Charles concerning the 2001 Escrow Agreement. Thus, any such claim would not require any unanticipated liability on Linda's part.

For all of these reasons, we conclude that Linda, as indemnitor, was not the "unwary and uninformed promisor" whom the Maryland courts intended to protect. The circuit court aptly summed it up with its pithy conclusion that the contract unambiguously demonstrated that, "at the time that this was happening, . . . [they] knew exactly what they were talking about."

We are not persuaded otherwise by Linda's reliance on the Court of Appeals' decision in *Adloo v. H.T. Brown Real Estate, Inc.*, 344 Md. 254, 257, 686 A.2d 298 (1996). In *Adloo*, the Court of Appeals held that an exculpatory clause in a real estate listing agreement did not apply when the indemnitee's own negligence caused the damage, even though the clause purported to exculpate the realtor for "damage of any nature whatsoever" to the homeowner's property. *See id.* The Court found that the exculpatory clause was ambiguous and did not clearly express an intention to exculpate the realtor from liability resulting from its own negligence. *See id.* at 267, 686 A.2d 298.

Linda points out that the Court of Appeals' characterization of the test necessary to meet *Crockett's* "unequivocal terms" standard "is a stringent and exacting one, under which the clause must not simply be unambiguous, but also understandable." *Id.* at 264, 686 A.2d 298. She stresses that "the Court did not include any limitation that this rule only applied to contracts for future services."

To be sure, the Court of Appeals has not explicitly stated that the Presumption Against Indemnification For Negligence applies only when the negligence occurs *after* the indemnification contract. Yet, after considerable searching, in Maryland and elsewhere, we have not found, nor has Linda supplied, any case in which the court excluded from the scope of an indemnification clause, damages arising from negligence occurring *before* the date of the indemnification agreement.[10]

---

**10.** In addition to the cases already discussed, Linda cites the following cases, both of which involved indemnification from injuries arising

Indeed, a number of cases have described the Presumption, with reference to future negligence only. *See Hyson v. White Water Mountain Resorts of Conn., Inc.,* 265 Conn. 636, 829 A.2d 827, 831 (2003)("[T]he ... rule is that a party cannot be released from liability for injuries resulting from its future negligence in the absence of language that expressly so provides")(footnote omitted); *Hornbeck v. All Am. Indoor Sports, Inc.,* 898 S.W.2d 717, 721 (Mo.Ct.App.1995)("While contracts exonerating a party from **acts of future negligence** are not against public policy, they are strictly construed against the party claiming the benefit of the contract and clear and explicit language in the contract is required to absolve a person from such liability")(emphasis added and citations omitted);[11] *Green Intern., Inc. v. Solis,* 951 S.W.2d 384, 387 (Tex.1997) ("[O]ur holding .... is explicitly limited to releases and indemnity clauses in which one party exculpates itself from its own future negligence") (citation omitted); *Hawkins ex rel. Hawkins v. Peart,* 37 P.3d 1062, 1066 (Utah 2001)("the law generally treats preinjury releases or indemnity provisions with greater suspicion than postinjury releases") (citation omitted). *See also Royal Ins. Co. of Am. v. Whitaker Contracting Corp.,* 824 So.2d 747, 751 (Ala.2002)("In determining whether indemnity contracts cover negligence by the indemnitee, we must consider the degree of control retained by the indemnitee over the activity or property giving rise to liability") (citations omitted).

---

from work not yet performed. *See Tatar v. Maxon Constr. Co.,* 54 Ill.2d 64, 294 N.E.2d 272, 274 (1973)(involving indemnification against claims arising from subcontractor's work not yet performed, expressed as claims "arising out of, or connected with, accidents, injuries, or damages **which may occur** upon or about the Subcontractor's work")(emphasis added); *Ratti v. Wheeling Pittsburgh Steel Corp.,* 758 A.2d 695, 701 (Pa.Super 2000)(involving indemnification against claims arising out of work not yet performed, expressed as "arising out of or in any manner resulting from the execution of the work provided for in this contract").

**11.** This case was cited with approval in *Adloo v. Brown Real Estate, Inc.,* 344 Md. 254, 263 (1996).

For these reasons, we conclude that it is not appropriate to apply the Presumption Against Indemnification For Negligence to the indemnification clause in the settlement agreement.

## Public Policy

In her second argument, Linda contends that agreements to indemnify a company against its own negligence are void as against public policy. In *Heat & Power,* the Court of Appeals found the indemnification was void as against public policy, pursuant to former Md.Code (1974, 1989 Repl.Vol.), Section 5–305 of the Courts & Judicial Proceedings Article (CJP), *recodified at* CJP Section 5–401 (2006 Repl.Vol.) *See Heat & Power Corp.,* 320 Md. 584, 592, 578 A.2d 1202.

Section 5–305 is inapplicable here, as the statute only refers to indemnity agreements in construction contracts. *See* CJP § 5–401. In the past, the Court of Appeals has declined to extend this statute to other indemnification agreements, because the General Assembly did not intend such an attenuated connection. *See Mass Transit Admin. v. CSX Transp., Inc.,* 349 Md. 299, 320, 708 A.2d 298 (1998).

The seminal case in Maryland that addresses invalidating contracts on public policy grounds is *Maryland–National Capital Park and Planning Comm. v. Washington Nat'l Arena,* 282 Md. 588, 607, 386 A.2d 1216 (1978). Judge Levine, writing for the Court of Appeals, explained the limits of the court's role in contract disputes:

Fearing the disruptive effect that invocation of the highly elusive public policy principle would likely exert on the stability of commercial and contractual relations, Maryland courts have been hesitant to strike down voluntary bargains on public policy grounds, doing so only in those cases where the challenged agreement is patently offensive to the public good, that is, where "the common sense of the entire community would ... pronounce it" invalid.... This reluctance on the part of the judiciary to nullify contractual arrangements on public policy grounds also serves to protect the public interest in having individuals exercise broad

powers to structure their own affairs by making legally enforceable promises, a concept which lies at the heart of the freedom of contract principle.

*Id.* at 606, 386 A.2d 1216 (citations omitted).

The Court then explained how a court should analyze a public policy argument against enforcement of a contract:

In the final analysis, it is the function of a court to balance the public and private interests in securing enforcement of the disputed promise against those policies which would be advanced were the contractual term held invalid. Enforcement will be denied only where the factors that argue against implementing the particular provision clearly and unequivocally outweigh "the law's traditional interest in protecting the expectations of the parties, its abhorrence of any unjust enrichment, and any public interest in the enforcement" of the contested term.

*Id.* at 607, 386 A.2d 1216 (citation and footnote omitted).

■ Maryland courts' recalcitrance in voiding contracts on public policy grounds is particularly acute when the involved parties are sophisticated, knowledgeable about the matter at hand, and of equal bargaining power:

We are not confronted here with a situation in which one party seeks enforcement of a contractual provision exacted from the other as a result of the former's superior bargaining power. In such cases a court might well elect to refuse implementation. *See* Strong, The Enforceability of Illegal Contracts, 11 Hastings L.J. 347, 348 (1961).

The case at hand, however, presents an entirely different set of circumstances. For one thing, neither party enjoyed any appreciable bargaining advantage over the other.... Furthermore, the [party seeking to void the contract] was controlled by persons with considerable knowledge and experience in business and finance. Consequently it was no unwitting participant in the transaction.

*Id.* at 612–613, 386 A.2d 1216. The Court of Appeals also considers legal representation in negotiating the contract as a factor favoring enforcement. *See id.* at 613, 386 A.2d 1216.

To the extent that *Price–Williams and Assocs., Inc. v. Nelson,* 631 So.2d 1016, 1019 (Ala.1994), suggests a contrary view, we do not believe the Court of Appeals would be persuaded by its reasoning.

■ In this case, at the time of the settlement agreement, both parties were aware of their actions with respect to monies paid to Linda by HealthSTAR in connection with the stock sale, without the knowledge of Charles. They either knew or were concerned that what they did was wrong. Linda was a highly sophisticated business entrepreneur, who controlled companies sold to HealthSTAR for about $20,000,000. In their settlement agreement, the parties carefully delineated which of them would take responsibility for possible liabilities arising in connection with that transaction. HealthSTAR indemnified Linda against claims by Charles "concerning the escrow under the 2001 Escrow Agreement." Linda indemnified HealthSTAR against claims by Charles relating to monies she received from HealthSTAR that were, in essence, payment for her stock, but disguised as compensation.

Although their action *vis a vis* Charles was fraudulent, the indemnification agreement constituted a legitimate business decision to decide between them, who would ultimately pay in the event Charles successfully sued them. This agreement did not hurt Charles, and did not harm the public. Moreover, because Linda was the person who received the $1 million dollars secreted from Charles, she obviously benefitted from the parties' wrongful conduct. She also benefitted from the settlement agreement, receiving $400,000 additional payment by HealthSTAR. We see no policy justification for giving Linda the windfall of obliterating her obligations under the settlement agreement.

### Effect Of Court's Dismissal Of Linda From Underlying Fraud Case

■ Linda offers still another argument. Relying on *Baltimore Gas and Elec. Co. v. Commercial Union Ins. Co.,* 113 Md.App. 540, 546, 688 A.2d 496 (1997), she contends:

[S]he had a duty to defend HealthSTAR during the period when claims were pending against HealthSTAR and Linda Kreter, i.e., prior to June 25, 2004. Thus, under the indemnity clause, Linda was responsible for payment of attorney's fees and costs incurred to defend HealthSTAR prior to June 25, 2004. However, on June 25, 2004, all claims were dismissed except the fraud claim solely against HealthS-TAR. Under the indemnification clause, she is not required to indemnify HealthSTAR for attorney's fees and costs incurred after that date. In Maryland, if a duty to defend exists at the outset of a case, but during the case all claims under the policy have been dismissed and the only remaining claims are claims outside the policy, the duty to defend is terminated as of the dismissal date.

Linda argues that all claims against her in the Charles Kreter litigation were dismissed on June 25, 2004, and therefore, under *BG&E* (hereinafter *"BGE"*), her duty to defend HealthSTAR ended on that day. In making this argument, Linda misreads *BGE*.

BGE, a utility company, brought suit against Commercial Union, an insurer, seeking a declaratory judgment that Commercial Union had a duty to indemnify BGE against a judgment entered against it in an underlying tort claim. The underlying claim was brought by a married couple ("the plaintiffs"), after the husband was injured when he fell into a utility pit that BGE requested Ferguson Trenching Company ("Ferguson") to dig for BGE's business needs. Ferguson was contractually obligated to obtain a general commercial liability insurance policy to protect both Ferguson and BGE in connection with Ferguson's work, and it obtained this policy from Commercial Union Insurance Company ("Commercial"). Coverage under this policy was limited to claims based on negligence by Ferguson and claims that BGE negligently failed to supervise Ferguson. It did not cover claims that BGE was negligent independently of Ferguson.

Although the plaintiffs initially sued both BGE and Ferguson, they dropped their claim against Ferguson and proceeded only against BGE for its negligence in failing to backfill the

pit. The jury found BGE liable because it negligently failed to backfill the pit. BGE then sued Commercial, seeking a declaratory judgment that Commercial had a duty to defend BGE. We held that after the plaintiffs dropped their claim against Ferguson, Commercial had no obligation to defend BGE against the remaining claims, because those claims only related to BGE's obligation to backfill the pit, work that was not within the scope of Ferguson's contract with BGE. Accordingly, we held that "BGE cannot compel Commercial to provide it with a defense based on claims which, although at one time asserted by [the plaintiffs], were no longer asserted, because such claims 'will not be generated at trial.'" *Id.* at 571–572, 688 A.2d 496 (citation omitted).

Linda considers BGE analogous to the present case because here, the claim against Linda was dismissed because the court found that it was precluded under principles of *res judicata*.[12] Therefore, she argues, based on our holding in *BGE*, that HealthSTAR's claim against Linda must be dismissed because Linda was dismissed from Charles's suit. We are not persuaded by Linda's analysis, because the facts and rationale of *BGE* materially differ from this litigation.

Linda's obligation to indemnify HealthSTAR is considerably broader than was Commercial's obligation to defend BGE. As we explained above, Commercial's obligation under its insurance policy was limited to claims based on negligence by Ferguson and claims that BGE negligently failed to supervise Ferguson. The policy simply did not cover negligence by BGE when there was no negligence by Ferguson.

But Linda's obligations to HealthSTAR under the indemnification clause were not dependent upon Linda's continuing direct liability to Charles for his claims. Nothing in the indemnification clause says that in order to be liable under that clause, Linda must also be liable for Charles' claims.

---

12. The underlying claims by Charles against Linda were dismissed on *res judicata* grounds, because the circuit court considered them intrinsic to their divorce proceedings, and not triable in a separate suit. We are not asked to address the validity of this ruling.

Reading the settlement agreement in this fashion would mean that Linda could escape her responsibility to indemnify HealthSTAR simply by entering a settlement with Charles. This is not a reasonable interpretation of the contract.

### Extrinsic Evidence

█ In her third argument, Linda advances the theory that the circuit court impermissibly rested its decision on evidence extrinsic to the settlement agreement. She claims this evidence should not have been admitted to interpret the contract because the contract was not ambiguous. She objects particularly to the circuit court's findings and conclusions in the Charles Kreter litigation against HealthSTAR in April of 2005. We reject her contention that the circuit court's decision, and the basis for its award in the Charles Kreter litigation, is not admissible. The basis for the circuit court's decision in that case must be considered in order to resolve this case, because the damage award against HealthSTAR in that case is the gravamen of HealthSTAR's claim for indemnification. A court cannot decide whether Charles' award for damages falls within the indemnification clause without knowing the nature of the claim and whether the damages awarded were of the sort contemplated by the parties to the settlement agreement.

In a similar vein, Linda also argues that "the only determination arising out of the [Charles Kreter litigation] relevant to the present case is that HealthSTAR was found liable to Charlie Kreter for its sole conduct under a fraud claim." She reasons that the basis of the court's decision cannot be considered because she "was not a party to the underlying case and she never had a full and fair opportunity to litigate the issues therein." She relies on *Anne Arundel County Bd. of Ed. v. Norville,* 390 Md. 93, 106–07, 887 A.2d 1029 (2005); *Lizzi v. Washington Metro. Area Transit Auth.,* 384 Md. 199, 206–07, 862 A.2d 1017 (2004); *Weatherly v. Great Coastal Express Co. Inc.,* 164 Md.App. 354, 369, 883 A.2d 924 (2005); *Thacker v. City of Hyattsville,* 135 Md.App. 268, 288–89, 762 A.2d 172 (2000). Her reasoning misses the mark. The circuit court's fact-finding and conclusions in the Charles Kreter litigation

against HealthSTAR are relevant because the circuit court needed to determine what that trial was about in order to see if it fell within the contractual indemnification that Linda undertook. The court needed to know that Charles' claim, and the damages awarded, were based on the extra $1 million that HealthSTAR paid to Linda, which Charles claimed was consideration for her stock.

Whether or not Linda had an opportunity to participate in the underlying fraud trial is a different issue. Linda asserts that after she was dismissed from the fraud suit, she unsuccessfully sought to re-assert herself as a party in that suit. She argues that because the court refused to allow her re-entry as a party, the circuit court in this case could not consider the findings and judgment in that suit in deciding the nature or amount of her indemnification obligation. The obstacle Linda faces in arguing this theory to this Court is that she never made the argument to the motions court.

We have reviewed the transcript of the summary judgment hearing, in which both sides were given full opportunity to advance their contentions. Linda made no argument at that hearing that her dismissal and unsuccessful effort to rejoin that suit precluded the circuit court from considering the results of that trial in deciding the cross-motions for summary judgment in this case.

Neither did she raise that argument in her Answer to Complaint for Declaratory and Injunctive Relief, her First Amendment to Answer to Complaint for Declaratory and Injunctive Relief, her Opposition to Plaintiff's Motion for Summary Judgment, her Memorandum of Points and Authorities in Opposition to Plaintiff's Motion for Summary Judgment, or her Cross Motion For Summary Judgment. This contention was not preserved and we will not address it.[13]

---

13. Linda alleged in paragraph 14 of her Counter Complaint for Declaratory Judgment:

14. Although Linda Kreter engaged Brassel & Baldwin, P.A. to represent and defend HealthSTAR, PRP and PRC, and was to be responsible within the scope of the covered claims defined in the

"Ordinarily, the appellate court will not decide any other issue unless it plainly appears by the record to have been raised in or decided by the trial court, but the Court may decide such an issue if necessary or desirable to guide the trial court or to avoid the expense and delay of another appeal." Md. Rule 8–131.

## CONCLUSION

For the foregoing reasons, we affirm the summary judgment granted by the circuit court.

**JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**

---

Settlement Agreement for such reasonable legal fees and costs, **Linda Kreter had no right to control or otherwise participate in the defense of HealthSTAR, PRP and PRC.** (Emphasis added.)
(emphasis added). This language, made in one pleading, and never mentioned again, does not give adequate notice to the circuit court of the nature of the argument that she now makes.