569 A.2d 715

**SPRINGLAKE CORPORATION, Receiver**

**v.**

**SYMMARRON LIMITED PARTNERSHIP, et al.**

**No. 849, Sept. Term, 1989.**

Court of Special Appeals of Maryland.

Feb. 8, 1990.

Dale E. Cantone (Deborah Farmer Minot and Hylton & Gonzales, on the brief), Baltimore, for appellant.

Raymond S. Smethurst, Jr. (Fletcher P. Thompson, and Adkins, Potts & Smethurst, on the brief), Salisbury, for appellees.

Argued before MOYLAN, WILNER and GARRITY, JJ.

WILNER, Judge.

This case is another part of the fallout descending from the machinations of Jeffrey Levitt, erstwhile president of Old Court Savings & Loan Association. The only question is whether the Circuit Court for Worcester County erred in concluding, on summary judgment, that a certain lease and

leaseback arrangement entered into at the insistence of Mr. Levitt was unenforceable because it violated a regulation promulgated by the State Board of Building, Savings and Loan Association Commissioners. We find no error and shall therefore affirm the judgment.

The underlying facts are not in substantial dispute. Michael G. Cappy, a developer, desired to build a motel in Ocean City. To that end, he formed a corporation known as Georgia Belle Corporation (GBC); the motel was to be called the Georgia Belle. In September, 1982, Cappy met with Levitt, who was then president of Old Court, to discuss an acquisition and construction loan. Cappy told Levitt that he needed $1,500,000 to buy the land and build the motel. Levitt, on behalf of Old Court, agreed to make that loan but only upon the condition that an entity known as Old Court Joint Venture, Inc. (OCJV), a wholly owned subsidiary of Old Court, be given a 20% interest in the project. Cappy agreed to that condition, and, relying on what he regarded as a commitment from Old Court,[1] he contracted for the purchase of the land and engaged an architect to prepare plans for the motel.

In furtherance of the arrangement, GBC and OCJV formed a limited partnership known as Symmarron Limited Partnership (Symmarron). The partnership agreement, dated October 26, 1982, showed GBC as the general partner with an 80% interest and OCJV as the limited partner with a 20% interest.

Shortly before the scheduled settlement on the land, Cappy was informed by the settlement attorney that only $1,250,000, rather than the promised $1,500,000, had been received from Old Court. Cappy immediately contacted Levitt, who assured him, "Don't worry about it. I'll give you what you need to finish the motel." As the $1,250,000 was more than sufficient to pay for the land, Cappy proceeded to settlement and began construction of the motel. Title to the land was taken in the name of Symmarron.

---

**1.** No formal written commitment letter ever issued from Old Court.

By March or April, 1983, the need not only for the other $250,000 but for an additional $62,000 as well became apparent. Cappy went to see Levitt, who agreed to have Old Court lend the additional money (the $250,000 initially promised plus the additional $62,000 requested) on three conditions: (1) OCJV's interest in the limited partnership was to be increased from 20% to 25%; (2) GBC had to agree to lease all of the furniture for the motel from another Old Court subsidiary, Old Court Investments Corp.; and (3) Symmarron, as the legal owner of the property, had to agree to the lease and leaseback arrangement at issue here. Obviously pressed, Cappy, on behalf of GBC and Symmarron, agreed to the three conditions, whereupon the appropriate documents implementing those conditions were prepared and signed and the additional $312,000 disbursed.

The third condition required Symmarron to lease the motel to an entity known as Pearlstein–Levitt Investments (PLI), a partnership in which Jeffrey Levitt had a 40% interest and his two children had a 10% interest. Unlike OCJV and Old Court Investments Corp., PLI was not a subsidiary or affiliate of the savings and loan association but was instead an entity owned entirely by the Levitt and Pearlstein families. The lease was for 20 years at a rental of $1 a year. PLI then subleased the motel to GBC for the same 20-year period at a rental of $12,000 a year. GBC was given the right, in the Lease Agreement, to purchase the lease from PLI at any time after five years for the sum of $100,000. By virtue of this arrangement, Levitt individually, through his 40% interest in PLI, extracted a consideration or benefit of at least $64,000 and possibly as much as $96,000 (less his share of the $1 a year rent).

PLI never paid to GBC the $1/year rent due under the lease. GBC paid the first year's rent of $12,000 under the sublease on October 1, 1983, but made no other payments. On July 15, 1985, Symmarron sold the motel to a third party, Ocean Properties, Inc. In making and consummating that sale, no attention was given to the lease and sublease. Apart from the fact that GBC's right to buy the lease was not then exercisable (less than five years having elapsed),

no money was paid to PLI and neither the lease nor the sublease was formally rescinded.

In July, 1986, as part of an attempt to extricate himself from some of the legal difficulties that had by then befallen him, Levitt assigned his partnership interest in PLI to the Maryland Deposit Insurance Fund Corporation (MDIF). A month later, appellant Springlake Corporation (Springlake) was appointed by the Circuit Court for Baltimore City as receiver for PLI. In August, 1988, Springlake filed this two-count action against Symmarron and GBC, seeking from the former the $100,000 it claims was due under the buy-out provision of the lease and from the latter $48,000 in rent allegedly due under the sublease for the years 1984–1987.

The defendants raised a number of defenses to Springlake's claim, but the one relied upon by the court in entering summary judgment for the defendants was that the lease and leaseback scheme was "illegal," or at least unenforceable, because it contravened a 1978 regulation that had been adopted by the Board of Building, Savings and Loan Association Commissioners, the State agency then charged with regulating savings and loan associations. The regulation, formerly codified as Md.Regs.Code tit. 9, § 05.01.43, provided, in pertinent part:

"A. Directors and officers occupy a fiduciary relationship to their association, and a director or officer may not engage or participate, directly or indirectly, in any business or transaction conducted on behalf of or involving the association, which would result in a conflict of his own personal interests with those of the association in a manner which would be detrimental to the association.

. . . . .

B. The following restrictions governing the conduct of directors and officers are imposed, but the restrictions are not to be construed as excusing these persons from the observance of the general fiduciary duty owed to the association:

. . . . .

(7) A director, officer, or employee may not solicit, accept, or agree to accept, directly or indirectly, from any person other than the association or a subsidiary of it, any gratuity, compensation, or other personal benefit in connection with the procurement of any loan made by the association or any subsidiary of it.

. . . . .

C. Violation of any of the sections above may constitute an unsafe and unsound practice necessitating the issuance of an order by the Division Director in accordance with Article 23, § 161 H, Annotated Code of Maryland."

Springlake concedes that the lease and leaseback arrangement constituted a violation of Section B 7 of the regulation. Levitt solicited, agreed to accept, and with respect to the one installment of rent paid by Symmarron actually did accept, compensation or other personal benefit from someone other than Old Court or its subsidiary in connection with the procurement of a loan from Old Court. The court concluded that that violation made the arrangement illegal and unenforceable. Springlake argues that the violation does *not* make the lease and sublease illegal or unenforceable and that, if they were illegal, the illegality had been "cured" by the time the suit was filed.

In *Thorpe v. Carte*, 252 Md. 523, 529, 250 A.2d 618 (1969), the Court quoted with approval two passages from the then-current *Restatement of Contracts* announcing that "[a]ny bargain is illegal if either the formation or the performance thereof is prohibited by constitution or statute" and that "[g]enerally a party to an illegal bargain cannot recover either damages for its breach or, after rescission, the performance he has rendered or its value." Similar language, expressing a broad doctrine of unenforceability, appears in several earlier and later Maryland cases. See, for example, *Goldsmith v. Mfgrs' Liability I. Co.*, 132 Md. 283, 286, 103 A. 627 (1918): "It is settled that where the contract which the plaintiff seeks to enforce is expressly or by implication forbidden by the statute, no Court will lend

its assistance to give it effect"; *Van Meter v. Wilkinson,* 187 Md. 492, 498, 50 A.2d 557 (1947); *Queen v. Agger,* 287 Md. 342, 346, 412 A.2d 733 (1980): "Contracts which violate statutes will not be enforced"; *McGinley v. Massey,* 71 Md.App. 352, 525 A.2d 1076 (1987).[2]

These broad statements, unfortunately, are a bit misleading. The Court has not, in fact, adopted such a rigid rule that any contract made in violation of any statute is unenforceable. What it has done, although sometimes fleetingly, is to examine the statute at issue and the public policy behind it in an attempt to discern whether the legislature intended for contracts made in violation of the statute to be void or unenforceable. Other Maryland cases have more clearly expressed this notion.

That some more circumspection is required was expressed long ago by the Court in *Lester v. Howard Bank,* 33 Md. 558 (1871). The Court observed at 562:

"The rule of law is well settled that no action will lie to enforce a contract *malum in se,* nor if executed, to

---

**2.** The positive law violated here, of course, was an agency regulation rather than a statute. Although we are not prepared to hold, as a matter of law, that a regulation is the full equivalent of a statute in this context, we believe that, in the circumstances of this case, it has the same effect. The Board was created by statute to regulate savings and loan associations and given not only certain specified powers but "such powers as may be necessary and proper to the full and effectual execution of the purposes of [the statute] relative to [savings and loan] associations." Md.Ann.Code art. 23, § 161E (1973 Repl.Vol.). Among the specific powers granted to the Board was the power to adopt regulations "as may be reasonable and necessary to carry out the provisions of [the statute]." The regulation at issue here was obviously in implementation of the statute and thus represented an enforcement of the legislative policy.

Although the issue has not been specifically addressed very often, a number of courts have made clear that a contract made in violation of an agency regulation adopted to implement a statute is treated as if it were in violation of the statute itself. *See Hawes Electric Co. v. Angell,* 332 Mass. 190, 124 N.E.2d 257 (1955); *Minardus v. Zapp,* 112 S.W.2d 496 (Tex.Civ.App.1938); *First Texas Sav. Ass'n of Dallas v. Dicker Ctr.,* 631 S.W.2d 179 (Tex.App.1982). We shall apply that principle in this case, although, for convenience, we shall discuss the concept in terms of statutes, as most of the cases have involved statutes.

recover money paid under it.... In regard to contracts not *immoral,* or *criminal* in themselves, but prohibited by statutory law, the same general rule may be said to apply, not however universal in its application, but subject to certain exceptions as binding in authority as the rule itself. Public policy, it must be borne in mind, lies at the basis of the law in regard to illegal contracts, and the rule is adopted not for the benefit of parties but of the public. It is evident, therefore, that cases may arise even under contracts of this character, in which the public interests will be better promoted by granting than by denying relief, and in such the general rule must yield to this policy."

Proceeding further along this line, the Court discussed a number of cases, including *Harris v. Runnels,* 53 U.S. (12 How.) 79, 13 L.Ed. 901 (1851), holding that, in determining whether a statutory violation renders a contract unenforceable, the court must examine the statute "to find out whether or not the makers of it meant that a contract in contravention of it should be void, or that it was not so to be." *Lester, supra,* 33 Md. at 564. It quoted in that regard the statement from *Harris* that "when the statute is silent and contains nothing from which the contrary can be properly inferred, a contract in contravention of it is void." *Id.* at 565. It announced then:

"Under the rule thus laid down, which we regard as just and reasonable, the rights and remedies of parties growing out of prohibited contracts are to be determined by the construction of the statute itself according to the well established rules of interpretation, and if it shall appear that it was not the intention of the Legislature to declare the contract void, although made against the prohibition this *intention* will be gratified, even if it should contravene some general rule of law."

*Id.* at 565.

Notwithstanding some of the more rigid statements made in intervening cases, that principle, of attempting to ascer-

tain the legislative intent and acting in accordance therewith, remains the law in Maryland. *Gannon & Son v. Emerson*, 291 Md. 443, 435 A.2d 449 (1981); *Montagna v. Marston*, 24 Md.App. 354, 330 A.2d 502 (1975). Some statutes or regulations are very clear in this regard, stating explicitly that any agreement made in violation of it is void or unenforceable. *See, for example,* Md.Com.Law Code Ann. §§ 11–112, 12–314(b)(1); Md. Real Prop.Code Ann. § 8–208(c)(1). As pointed out in *Restatement (Second) of Contracts* § 178, comment b, however, that is not the normal case:

> "Only infrequently does legislation, on grounds of public policy, provide that a term is unenforceable. When a court reaches that conclusion, it usually does so on the basis of a public policy derived either from its own perception of the need to protect some aspect of the public welfare or from legislation that is relevant to that policy although it says nothing explicitly about unenforceability. See § 179. In some cases the contravention of public policy is so grave, as when an agreement involves a serious crime or tort, that unenforceability is plain. In other cases the contravention is so trivial as that it plainly does not preclude enforcement. In doubtful cases, however, a decision as to enforceability is reached only after a careful balancing, in light of all the circumstances, of the interest in the enforcement of the particular promise against the policy against the enforcement of such terms."

The nature of the balancing process is set forth in the text of § 178. Where the legislation does not expressly provide for unenforceability, the promise will be declared unenforceable on grounds of public policy if "the interest in its enforcement is clearly outweighed in the circumstances by a public policy against the enforcement of such terms." In weighing the interest favoring enforcement, account is to be taken of the parties' "justified expectations," any forfeiture that would result if enforcement were denied, and "any special public interest in the enforcement of the particular

term." Weighing against enforcement are the strength of the public policy, the likelihood that a refusal to enforce the promise will further that policy, the seriousness of the misconduct involved and the extent to which it was deliberate, and the directness of the connection between the misconduct and the promise.

■ The "bent" of the *Restatement* seems to favor enforcement in the doubtful cases. So far, the Maryland courts have not adopted that approach where the contract violates some positive law. See, however, *Md.–Nat'l Cap. P. & P. v. Wash. Nat'l Arena,* 282 Md. 588, 604–07, 386 A.2d 1216 (1978), approving the *Restatement* approach where the alleged invalidity is based on general public policy considerations. Putting aside the broad statements appearing in cases such as *Thorpe v. Carte, supra,* 252 Md. 523, 250 A.2d 618 and *Queen v. Agger, supra,* 287 Md. 342, 412 A.2d 733, under *Lester* and *Gannon,* which we believe represent the actual Maryland view, the question is to be decided by a more neutral examination. If a legislative intent can be ascertained, that intent will prevail; if no such intent is ascertainable from the statute or its history, the court must apply those factors it believes appropriate in determining whether, as a matter of overriding public policy manifested by the statute, the violation ought to preclude judicial enforcement. The considerations set forth in § 178 of the *Restatement (Second)* are certainly relevant, although others have also been expressed.

There is some legislative history to the regulation before us, but, in our view, it is not sufficiently clear on the point at issue to be conclusive. In April, 1978, a predecessor proposed regulation was presented by the Board of Building, Savings and Loan Association Commissioners to the General Assembly Committee on Administrative, Executive, and Legislative Review. *See* 5:9 Md.Reg. 704 (May 5, 1978). The pertinent part of that proposed Regulation was somewhat broader than the one ultimately adopted. It precluded any director, officer, employee, *or attorney* from soliciting or accepting from any person other than the association any

gratuity, compensation, or other personal benefit "for any action taken by the association or for endeavoring to procure any such action." *Id.* A violation of that or any other part of that proposed regulation was subject to being declared an unsafe and unsound practice "necessitating appropriate supervisory action by the Division." *Id.*

For reasons not clearly documented, that proposed regulation was withdrawn by the Board in favor of the one submitted in August, 1978 and ultimately adopted. There appear to be four major differences between the two drafts: (1) the earlier draft included attorneys within the prohibition whereas the later one did not; (2) the earlier draft prohibited solicitation or receipt of a benefit for any action or the procurement of any action by the association, whereas the later draft was limited to the procurement of loans; (3) the later draft allowed the individual to receive a benefit from a subsidiary of the association; and (4) the later draft limited the Division's authority in the event of a violation to an order under then Md.Ann. Code art. 23, § 161H to discontinue the practice.

These changes suggest the reason why the initial proposal was withdrawn and replaced by the August submission. There is nothing in the record before us or in the files of the Committee on Administrative, Executive, and Legislative Review to indicate, however, that any attention was given, as to either proposal, to the validity or enforceability of agreements made in violation of the regulation. There is, in other words, no clear expression of intent on the part of the Board or the legislative committee in that regard. We are left, then, to consider the other appropriate factors.

We shall first address, and reject, appellant's contention that, by specifically allowing the Division to issue a discontinuance order, the regulation has, in effect, provided an exclusive remedy or sanction for its violation, thereby indicating an intent not to provide the additional sanction of unenforceability. Most prohibitory statutes contain specific sanctions or remedies for violations, but, unless the statute

itself indicates that those sanctions or remedies are exclusive, that does not, of itself, answer the question of whether a prohibited contract is enforceable. Absent an indication of exclusivity, the chosen sanction is but one factor to consider in determining the nature and strength of the public policy evidenced by the statute. It is certainly clear that the imposition of a criminal penalty does not preclude a finding of unenforceability. *See Van Meter v. Wilkinson, supra,* 187 Md. 492, 50 A.2d 557; *U.S. v. Mississippi Valley Co.,* 364 U.S. 520, 81 S.Ct. 294, 5 L.Ed.2d 268 (1961); *K & R Engineering Co., Inc. v. United States,* 222 Ct.Cl. 340, 616 F.2d 469 (1980); Annotation, *Validity of Contract in Violation of Statute Imposing Criminal Sanction But Not Specifically Declaring Contract Invalid,* 55 A.L.R.2d 481 (1957). That an administrative sanction is chosen instead of a criminal one should not require a different result.

For much the same reason, we do not believe that the statement quoted in *Lester v. Howard Bank, supra,* that when the statute is silent on the issue, the contract is void, represents the current Maryland law. Such a notion assumes as a matter of law a legislative intent for which there may be no basis in fact; it also precludes the court from actually weighing the public policy behind the statute and balancing that policy against the general sanctity of contracts. We turn then to the various factors relevant to a proper consideration of the issue.

■ *Restatement (Second) of Contracts* § 178(2) mentions as factors favoring enforceability the parties' justified expectations, any forfeiture that would result from non-enforcement, and any special public interest in enforcement. None of them are particularly strong in this case. As we observed, Levitt imposed this scheme on Cappy, not as a legitimate and innocent part of the original undertaking, but after the basic commitment had been made and confirmed, when Cappy was particularly vulnerable. There was clearly an element of duress involved. More importantly, the parties themselves seemed to treat this arrangement rather casually. PLI, as we indicated, never did pay any

part of the rent reserved under the lease; for over three years, no attempt was made to collect the rent due under the sublease; and, when the property was sold in July, 1985, neither party took any account of the lease and sublease. In this light, to declare the agreement unenforceable would not give it much less consideration than the parties themselves gave it. Nor do we see any special public interest in enforcing the agreement.

Weighing against these rather weak factors in favor of enforcement are substantial policy reasons not to enforce the agreement. The regulation in question was obviously designed to help protect the integrity of an industry that affected the public welfare in a direct and substantial way. As events unfolded, of course, that protection was woefully inadequate (*see* W. Preston, *Report of Special Counsel on the Savings and Loan Crisis*, January, 1986), but that does not detract from the function of the regulation, which has since been considerably strengthened and, in part, made statutory. *See* Md.Fin.Inst.Code Ann. § 9–906; Md.Regs. Code tit. 9, §§ 05.03.06 and .07. The public policy behind the regulation, in other words, was a strong one. Contracts in violation of regulations of this type, prohibiting conflicts of interest and personal dealings by fiduciaries whose activities affect the public welfare, are particularly susceptible to being declared unenforceable on public policy grounds. See *U.S. v. Mississippi Valley Co., supra*, 364 U.S. 520, 81 S.Ct. 294.

The misconduct here was, of course egregious, serious, and deliberate. Little more needs to be said of that. Moreover, the arrangement at issue was the direct and intended product of that misconduct.

In terms of the *Restatement* principles, that leaves us then with the question of whether a refusal to enforce the lease and sublease will further the policy behind the regulation. Although not keying in particular on this factor, Springlake urges that it should not be tarred with the indiscretions of Levitt, that, as the court-appointed receiver, it is entirely innocent in the matter, and that, as things

stand today, the public policy would actually favor enforcement as that would allow MDIF, a public agency, to recover some money. In this particular setting, there may be some superficial allure to that argument, but on closer examination, it too is found wanting.

For one thing, there is some question whether this argument was presented to the circuit court and thus preserved for appellate review. For another, a receiver generally stands in the place of the person or entity for which he or she is the receiver. Most important, however, as the *Lester* Court made clear, the rule of unenforceability "is adopted not for the benefit of parties but of the public." 33 Md. at 562. To enforce the contract merely because an innocent person has succeeded to the interest of the culpable party would actually foster violations. Persons such as Levitt could freely violate statutes and regulations and recover their prohibited compensation not from the initial contract but from an assignment of it to a third party. The doctrine espoused by Springlake would simply open up a kind of secondary market for unlawful contracts and thus actually weaken implementation of the public policy. That is not something we are anxious to encourage. Conversely, notwithstanding other sanctions—in this instance a rather weak one—perhaps the best way to deter activity such as occurred here is to remove the economic benefit from it. Unenforceability very definitely would promote the public policy established by the statute and regulation.

Although we have used the *Restatement* principles in our weighing process, our conclusion, that the arrangement at issue is unenforceable, would be the same—indeed would be even more compelled—if we followed strictly and literally the language of cases such as *Thorpe, Queen,* and even *Lester.* The arrangement sought to be enforced by Springlake was a deliberate and gross violation of an important public policy established by valid governmental regulation, and the courts should not lend their aid to such a venture.

JUDGMENT AFFIRMED; APPELLANT TO PAY THE COSTS.