6 A.3d 935

**Paul F. STITZEL**

v.

**STATE of Maryland, et al.**

**No. 1017, Sept. Term, 2009.**

Court of Special Appeals of Maryland.

Oct. 5, 2010.

Kendall A. Desaulniers and Kent Oliver (Miller, Oliver, Stone & Divelbiss on the Hagerstown, MD), for appellant.

Craig A. Nielsen, Annapolis, Jason Morton and William Schildt, Hagerstown (Thomas F. Filbert, Douglas Gansler, Atty. Gen., Strite and Schildt), on the briefs, for appellee.

Panel: EYLER, JAMES R., MEREDITH, J.
FREDERICK SHARER (Retired, specially assigned), JJ.

MEREDITH, J.

In this appeal from a judgment of the Circuit Court for Washington County, we review an agricultural land preservation easement that was granted pursuant to Maryland Code (1973, 1999 Repl.Vol.), Agriculture Article ("AG"), §§ 2–501, *et seq.* We shall affirm the circuit court's conclusion that the landowner who had subjected 264 acres of his property to a preservation easement was prohibited from conveying, without the prior approval of the Maryland Agricultural Land Preservation Foundation ("MALPF" or "the Foundation"), a portion of the land that was encumbered by the preservation easement.

I.

Paul and Helen Stitzel (collectively referred to as "Stitzel" or "appellant"), own farmland located in Washington County. In 1999, Stitzel entered into an Agricultural Land Preserva-

tion District Agreement ("the District Agreement") with the Foundation, one of the appellees. Under the District Agreement, entered into pursuant to AG § 2–509(b), Stitzel agreed to keep approximately 264 acres of real property in agricultural use for a minimum of five years. The Foundation recognized the 264 acres of land as an Agricultural Preservation District.[1]

By Deed of Easement ("the Easement") dated January 8, 2002, Stitzel granted to the Foundation an agricultural preservation easement that, in essence, obligated Stitzel and his successors in interest to use the 264 acres of land "solely for agricultural use in accordance with the provisions of the Agriculture Article, Title 2, Subtitle 5." Among the covenants contained in the Easement was an agreement by Stitzel as follows: "The land subject to this Deed of Easement may not be subdivided for any purpose including subdivision, off conveyance and the movement of boundary lines unless written approval first has been obtained from the [Foundation]." To compensate Stitzel for subjecting the 264 acres of land to the Easement, the Foundation paid him $570,230.03.

In 2005, Stitzel purported to sell a 15.91 acre lot ("Lot 14") that was part of the land encumbered by the Easement to Donald and Virginia Bowers (collectively "Bowers"), appellees and cross-appellants, for $370,000.00. Due to an unfortunate series of errors, Stitzel did not take any action to apprise Bowers of the agricultural preservation restrictions; nor did Stitzel seek the Foundation's approval of the proposed sale and conveyance of Lot 14. The Easement was not discovered by Bowers's title search because the Foundation's title company had erroneously recorded the Easement in Frederick County. Nor did Bowers's title company bring to Bowers's attention the District Agreement that had been recorded in Washington County in 1999.

---

1. Prior to 2007, AG § 2–510(a) required that land be recognized as an agricultural preservation district before the Foundation could purchase an agricultural preservation easement encumbering that land. That requirement was eliminated effective July 1, 2007.

After Bowers took possession of Lot 14 and began to explore subdivision of the parcel, the Foundation learned of the 2005 conveyance. The State of Maryland, to the use of the Maryland Department of Agriculture, on behalf of the Foundation, filed suit against Stitzel and Bowers in the Circuit Court for Washington County. For simplicity, we will refer to the complainant in the suit as the Foundation.

The Foundation's complaint, as amended, alleged that Lot 14 was encumbered by the District Agreement and the Easement, and both of those documents included a covenant that the owner would not subdivide the land for any purpose without first obtaining the approval of the Foundation. The Foundation sought a declaratory judgment declaring the rights and liabilities of the parties with respect to the development restrictions upon Lot 14, and declaring the deed from Stitzel to Bowers null and void.

Stitzel filed a counter complaint against the Foundation, seeking a declaratory judgment that the Easement did not preclude his conveyance of a lot that had been legally subdivided prior to the time it was encumbered.

Bowers, too, filed a counter complaint, and Bowers also filed a cross-claim against Stitzel. Initially, Bowers sought a declaratory decree that they took Lot 14 free and clear of the agricultural preservation restrictions, but they subsequently sought a declaratory judgment declaring the conveyance of Lot 14 null and void. Bowers's cross-claim against Stitzel sought monetary compensation upon a number of theories that will be discussed in more detail later in this opinion.[2]

## II.

The parties each moved for summary judgment, and the circuit court ruled in favor of the Foundation and Bowers. The court rejected Stitzel's contention that he had never

---

2. Bowers also filed a third party claim against their own title company, Realty Title Company, Inc. Realty Title has not appealed the money judgment that was entered against it, and is not a party to this appeal.

intended for Lot 14 to be included in the assemblage of property that was subject to the District Agreement and Easement; Stitzel does not challenge that ruling on appeal. With respect to whether the agreements with the Foundation and the regulations adopted to implement the agricultural land preservation program prohibited the conveyance of a portion of the land covered by the District Agreement and Easement, the circuit court was persuaded that such transfers require the prior approval of the Foundation.

The circuit court held that the conveyance of Lot 14 to Bowers violated covenants contained in the District Agreement and the Easement against subdividing the land. In the District Agreement, Stitzel had agreed:

[F]or so long as the [District Agreement] remains in effect:

\*       \*       \*

(2) The landowner agrees neither to subdivide nor develop the land for residential, commercial or industrial purposes; [and]

(3) The landowner agrees not to subdivide the land for any purpose unless the Foundation first has approved the proposed subdivision. . . .

Similarly, in the Easement, Stitzel "covenant[ed] and agree[d] as follows":

(g) The land subject to this Deed of Easement may not be subdivided for any purpose including subdivision, off conveyance and the movement of boundary lines unless written approval first has been obtained from the [Foundation].

The circuit court noted that, although AG § 2–509(b)(7)(v) provides "[n]othing in this section shall preclude the landowner from selling his property," the Foundation asserted that that provision is limited by other sections of the subtitle that restrict conveyances of portions of the land within an agricultural preservation district. With respect to a sale of less than the entire assemblage of property covered by the Easement, the Foundation asserted that the regulations in Code of

Maryland Regulations Title 15, Subtitle 15, Chapter 01 ("Guidelines for the Maryland Agricultural Land Preservation Program") control.

In AG § 2–504(4), the legislature delegated to the Foundation the power "[t]o adopt … regulations and procedures necessary to implement the provisions of this subtitle." COMAR 15.15.01.17 H(1) states: "A landowner may not subdivide land subject to restrictions of an agricultural land preservation district or easement without written approval from the Foundation." The term "subdivision" is defined as follows in COMAR 15.15.01.01–2B(7): " 'Subdivision' means the division of land into two or more parts or parcels."

Pointing to a different definition of "subdivision" in the statute regarding land use—Maryland Code (1957), Article 66B, § 1.00(*l*)—Stitzel argued that the subdivision which created Lot 14 had taken place long before that parcel was subjected to the District Agreement and Easement. Art. 66B, § 1.00 states:

(a) *In general.*—In this article the following words have the meanings indicated, except where the context clearly indicates otherwise.

*     *     *

(1) *Subdivision.*—(1) "Subdivision" means the division of a lot, tract, or parcel of land into two or more lots, plats, sites, or other divisions of land for the immediate or future purposes of selling the land or of building development.

(2)(i) "Subdivision" includes resubdivision.

The circuit court concluded that the statutory definition in Art. 66B did not prevail over the definition contained in the regulation that was adopted to implement the Maryland Agricultural Land Preservation Program, *i.e.,* COMAR 15.15.01.01–2B(7). The court concluded: "The definition of 'subdivision' found in the regulation adopted by [the Foundation], … simply contemplates the subtraction of a portion of land within an agricultural district or subject to an easement." In the view of the circuit court, all of the property that was included within the District Agreement and subject to the

Easement "should be considered one parcel," sometimes referred to in the documents as the "subject property" or "the land." There was also deposition testimony in the record from representatives of the Foundation who expressed the view that, "[r]egardless of how many parcels are under easement, it is treated as one unit under easement."

The court quoted from *MTA v. King*, 369 Md. 274, 288, 799 A.2d 1246 (2002), noting "the 'great deal of deference [that] is owed to an administrative agency's interpretation of its own regulation,' " and concluded:

> In light of the statutes and regulations governing the Maryland Agricultural Land Preservation Foundation and the language used in the instruments effecting the establishment of the agricultural district and easement over the Stitzels' land, the sale of Lot 14, being a portion of the 264.13 acres owned by the Stitzels and encumbered by the Easement, constitutes a subdivision and is prohibited.

■ On appeal, Stitzel argues that the circuit court erred in concluding that the conveyance of Lot 14 to Bowers was prohibited by either the express language of the District Agreement, the Easement, or the applicable regulations. Stitzel asserts:

> [W]here the Legislature has expressly protected a landowner's right to sell land included in an agricultural district and has specifically empowered MALPF to restrict only the use of such land, not its alienability, by means of easement acquisitions, it logically follows that a landowner's right to sell land subject to an agricultural easement is also protected.

Stitzel further argues that the term "subdivide," as used in the covenants in the District Agreement and Easement, should be interpreted in accordance with common parlance, which is more akin to the definition found in Art. 66B, § 1.00(*l* ). Stitzel also contends that such an interpretation of "subdivide" would be more consistent with the result in *Land Preservation v. Claggett*, 412 Md. 45, 985 A.2d 565 (2009).

We conclude that the circuit court properly looked to CO-MAR 15.15.01.01–2B(7) for guidance in interpreting the language in the District Agreement and Easement. The Foundation was empowered by AG § 2–504(4) to adopt such implementing regulations and definitions. *See Fogle v. H & G Restaurant,* 337 Md. 441, 453–55, 654 A.2d 449 (1995); *Oyarzo v. Dept. of Health,* 187 Md.App. 264, 288–91, 978 A.2d 804, *cert. denied,* 411 Md. 601, 984 A.2d 245 (2009). The Foundation's interpretation of the word "subdivide," as used in the covenants, is certainly consistent with the intent of the Maryland General Assembly to preserve tracts of land that are large enough to accommodate agricultural activities. The policy in favor of agricultural preservation is expressly set forth in AG § 2–501, which states:

It is the intent of the Maryland General Assembly to preserve agricultural land and woodland in order to: provide sources of agricultural products within the State for the citizens of the State; control the urban expansion which is consuming the agricultural land and woodland of the State; curb the spread of urban blight and deterioration; and protect agricultural and woodland as open-space land.

The Foundation's interpretation of the restrictive language in the Easement is also consistent with the plain meaning of the phrase "[t]he land subject to this Deed of Easement may not be subdivided for any purpose including ... off conveyance ... unless written approval first has been obtained from the [Foundation]." The Foundation's construction is the most rational way to interpret the covenant's reference to "off conveyance."

In view of the evidence in the record that indicated that smaller parcels of land can be less valuable for agricultural uses, we conclude that the circuit court did not err in finding that the sale of Lot 14 to Bowers was a subdivision that required the prior approval of the Foundation.

We recognize that, in the *Claggett* case, the Court of Appeals commented that an agricultural preservation easement similar to the Easement in this case "does not restrict land

transfer," 412 Md. at 64, 985 A.2d 565, and "restricted use, not transfers." *Id.* at 70, 985 A.2d 565. Despite those general comments regarding transfers, however, the Court of Appeals held in *Claggett* that the specifically contemplated transfer under consideration in that case was not permitted because it was contrary to the Foundation's goal of preserving an assemblage of land subject to an easement. Consequently, *Claggett* does not alter our view that the circuit court correctly construed the covenant against subdividing the land embraced by the Easement for off conveyance.

## III.

The circuit court noted that "[n]either the [agricultural land preservation] statute nor the regulations promulgated pursuant to the statute's enabling authority [*i.e.*, AG § 2–504(4) ] expressly state that any contract or other agreement made in contravention of them is void or unenforceable." Nevertheless, after applying the analysis this Court outlined in *Springlake Corp. v. Symmarron Ltd.,* 81 Md.App. 694, 569 A.2d 715 (1990), the circuit court concluded that public policy considerations against enforcement required the court to declare the purported conveyance of Lot 14 null and void.

In *Springlake,* a court-appointed receiver filed suit to collect past due rent and fees the receiver claimed pursuant to a lease that had been entered into at the behest of Jeffrey Levitt, an officer and director of Old Court Savings & Loan Association. The defendants argued that the lease arrangement violated the Maryland regulation prohibiting directors and officers of savings and loan associations from receiving personal benefits from such transactions. *Id.* at 698, 569 A.2d 715 (citing "[t]he regulation[ ] formerly codified as Md. Regs.Code tit. 9, § 05.01.43"). The receiver conceded that the lease arrangement constituted a violation of the regulation, but argued that the violation of the regulation did not make the lease unenforceable. Writing for this Court, Judge Alan M. Wilner noted that several older cases from the Court of Appeals contain language stating that a contract which violates a statute will not be enforced. Judge Wilner explained that

such statements were overly simplistic.  He wrote, 81 Md. App. at 700, 569 A.2d 715:

> These broad statements, unfortunately, are a bit mislead-ing.  The Court has not, in fact, adopted such a rigid rule that any contract made in violation of any statute is unen-forceable.  What it has done, although sometimes fleetingly, is to examine the statute at issue and the public policy behind it in an attempt to discern whether the legislature intended for contracts made in violation of the statute to be void or unenforceable.  Other Maryland cases have more clearly expressed this notion.

We cited several cases to support our conclusion in *Spring-lake* that, "in determining whether a statutory violation ren-ders a contract unenforceable, the court must examine the statute 'to find out whether or not the makers of it meant that a contract in contravention of it should be void, or that it was not so to be.'" *Id.* at 701, 569 A.2d 715 (quoting *Lester v. Howard Bank*, 33 Md. 558, 564 (1871)) (citing *Harris v. Runnels*, 53 U.S. (12 How.) 79, 13 L.Ed. 901 (1851)).  We stated in *Springlake*, 81 Md.App. at 701–02, 569 A.2d 715:

> Notwithstanding some of the more rigid statements made in intervening cases, that principle, of attempting to ascer-tain the legislative intent and acting in accordance there-with, remains the law in Maryland.  *Gannon & Son v. Emerson*, 291 Md. 443, 435 A.2d 449 (1981); *Montagna v. Marston*, 24 Md.App. 354, 330 A.2d 502 (1975).

We noted, however, *id.* at 702–03, 569 A.2d 715, that the legislative intent with respect to enforceability of a contract that violates a statute or regulation is not always obvious, and in such situations, the courts apply a balancing process:

> Some statutes or regulations are very clear in this regard, stating explicitly that any agreement made in violation of it is void or unenforceable.  *See, for example,* Md.Com.Law Code Ann. §§ 11–112, 12–314(b)(1);  Md. Real Prop.Code Ann. § 8–208(c)(1).  As pointed out in *Restatement (Second) of Contracts* § 178, comment b, however, that is not the normal case:

"Only infrequently does legislation, on grounds of public policy, provide that a term is unenforceable. When a court reaches that conclusion, it usually does so on the basis of a public policy derived either from its own perception of the need to protect some aspect of the public welfare or from legislation that is relevant to that policy although it says nothing explicitly about unenforceability. See § 179. In some cases the contravention of public policy is so grave, as when an agreement involves a serious crime or tort, that unenforceability is plain. In other cases the contravention is so trivial as that it plainly does not preclude enforcement. In doubtful cases, however, a decision as to enforceability is reached only after a careful balancing, in light of all the circumstances, of the interest in the enforcement of the particular promise against the policy against the enforcement of such terms."

The nature of the balancing process is set forth in the text of § 178. Where the legislation does not expressly provide for unenforceability, the promise will be declared unenforceable on grounds of public policy if "the interest in its enforcement is clearly outweighed in the circumstances by a public policy against the enforcement of such terms." In weighing the interest favoring enforcement, account is to be taken of the parties' "justified expectations," any forfeiture that would result if enforcement were denied, and "any special public interest in the enforcement of the particular term." Weighing against enforcement are the strength of the public policy, the likelihood that a refusal to enforce the promise will further that policy, the seriousness of the misconduct involved and the extent to which it was deliberate, and the directness of the connection between the misconduct and the promise.

We summarized the rule as follows, *id.* at 703, 569 A.2d 715: If a legislative intent can be ascertained, that intent will prevail; if no such intent is ascertainable from the statute or its history, the court must apply those factors it believes appropriate in determining whether, as a matter of overriding public policy manifested by the statute, the violation

ought to preclude judicial enforcement. The considerations set forth in § 178 of the *Restatement (Second)* are certainly relevant, although others have also been expressed.

In the present case, the parties before us are in agreement that the analysis set forth in *Springlake* controls. And there is agreement that the circuit court was obligated to engage in the balancing process to determine whether the conveyance of Lot 14 should be declared void. The circuit court observed:

Section 178(2) of the *Restatement (Second)* enumerates the following factors that may be considered in weighing the interest in the enforcement of a term:

(a) the parties' justified expectations,

(b) any forfeiture that would result if enforcement were denied, and

(c) any special public interest in the enforcement of the particular term.

None of these factors is particularly strong in the present case. Here, there are three parties that have expectations vis a vis the transaction: MALPF, the Stitzels, and the Bowerses. The parties agree that, from a land record standpoint, Lot 14 is clearly covered by the District Agreement and the Easement. Counsel for the Stitzels conceded at oral argument that, as between MALPF and the Stitzels, the District Agreement and the Easement are valid and enforceable. Pursuant to the applicable regulations, the Stitzels needed MALPF's approval before they could lawfully convey Lot 14 to the Bowerses. COMAR 15.15.01.03.A. This restriction is a justifiable expectation between MALPF and the Stitzels. As between the Stitzels and the Bowerses, the Bowerses have asked that their transaction with the Stitzels be voided. As noted in the Bowerses' papers, they expected to receive Lot 14 free and clear of the types of restrictions set forth in the District Agreement and Easement. While the Bowerses have legal arguments that they are not bound by the terms of the Easement since it was recorded after they took title to Lot 14, they certainly did

not expect to be engaged in potentially protracted (and expensive) litigation concerning the property.

Another factor favoring enforcement of a contract is whether any forfeiture would result if enforcement were denied. Again, the Bowerses affirmatively seek a declaration that the transaction is void and they assert no claim of forfeiture. The Stitzels, on the other hand, would have to forfeit the proceeds of the sale of Lot 14 if the transaction is determined to be void. In the balancing process, however, the Stitzels' forfeiture is less significant because their actions in selling Lot 14 are in contravention of their agreements with MALPF. Finally, in considering the factors favoring enforcement, there is no special public interest that would be served by enforcing the terms of the agreement.

(Footnotes omitted.)

Turning to the factors that favored declaring the deed void, the circuit court stated:

On the other side of the equation are substantial policy reasons not to enforce the sales transaction for Lot 14. The express intent of the statute is to preserve agricultural land and woodland. Md.Code Ann., Agric. § 2–501 (2007 Repl. Vol.) COMAR 15.15.01.17 H(1) provides that "[a] landowner may not subdivide land subject to restrictions of an agricultural land preservation district or easement without written approval from [MALPF]." Moreover, Section I of that Regulation provides that both the subdivided portion and all remaining parcels shall be at least 50 acres. This regulation is consistent with the enabling statute. See Md.Code Ann., Agric. § 2–509(d)(2) (2007 Rep[l]. Vol.) Furthermore, a landowner is entitled to request termination of an easement after 25 years based upon "the feasibility of profitable farming on the subject land." *Id.* § 2–514(b), (c)(1). MALPF has a strong interest in ensuring that parcels consisting of fewer than 50 acres not be subdivided because there is a greater likelihood that such parcels will not be viable for profitable farming. Because the landowner has been paid for the preservation easement with public funds, there is an important public policy to ensure that the

landowner does not circumvent the entire agricultural land preservation program by selling smaller parcels to third parties who may later argue that the smaller parcel is not viable for farming. This point goes to the heart of factor (3)(b) in Section 178 of the *Restatement (Second)*. If this court permitted landowners such as the Stitzels to sell smaller parcels to third parties without MALPF's approval, the very foundation of the land preservation program would be severely damaged because the owners of the smaller parcels would be in a much better position to argue that profitable farming is no longer viable and therefore the easement should be terminated pursuant to the provisions of Section 2–514 of the Agriculture Article.

(Footnotes omitted.)

The circuit court determined that the factors in favor of declaring the deed void led the court to conclude, after "[w]eighing the factors both for and against enforceability, it is clear that the public policy reasons against enforcement must prevail."

Although the parties to this appeal agree that *Springlake* controls, Stitzel contends that the circuit court erred in reaching the conclusion that the public policy considerations weigh clearly in favor of declaring the deed void. Stitzel contends that the Restatement's three factors supporting enforcement weigh heavily in his favor. With respect to the first factor ("the parties' justified expectations"), Stitzel claims that the circuit court failed to consider the fact that Bowers had notice of the preservation restrictions by virtue of the properly recorded District Agreement, and Bowers could not have justifiably expected to receive Lot 14 free and clear. The circuit court observed, however, that Bowers contended that they "expected to receive Lot 14 free and clear of the types of restrictions set forth in the District Agreement and Easement." The contract of sale did not apprise Bowers of the agricultural preservation restrictions, and, because of the negligence of their title search company, the Bowerses did not learn of the District Agreement until after they had completed their purchase.

With respect to the second factor ("any forfeiture that would result from nonenforcement"), Stitzel argues that the Foundation may have to forfeit its easement over Lot 14 because the Foundation originally recorded the deed of easement in the wrong county. But the Foundation's rights under the Easement would be protected rather than forfeited if the Lot 14 conveyance is voided. And, although Stitzel will be compelled to refund the purchase price, Stitzel will resume ownership of valuable real estate.

Stitzel claims that the Restatement's third factor supporting enforcement ("any special public interest in the enforcement of the" contract), should have also weighed in his favor. First, he observes that parties should be held to the terms of their bargains. Based upon that "major overriding public policy interest," Stitzel asserts that the terms of his sales contract with Bowers should be enforced. This argument ignores the offsetting interest that the Foundation has in the enforcement of Stitzel's contractual obligations. Second, Stitzel stresses the public interest in preserving the reliability of public land records, which would not be served by voiding his deed after it had been recorded. But there was no evidence in the record that any party had detrimentally relied upon the recorded deed for Lot 14. As a consequence, there was no genuine concern in this case that the land records might be made unreliable by virtue of the court refusing to enforce the deed to Lot 14.

Stitzel asserts that "nullification and voidance of the Stitzel/Bowers Deed is entirely unnecessary in order to uphold the underlying public policy of preserving agricultural land." The circuit court, however, was persuaded that the Foundation's goal of preserving large tracts of land tipped the balance in favor of voiding a deed that had the effect of severing a 15 acre parcel from the adjoining 250 acres. The circuit court found, based upon testimony in the record as well and the statute and enabling regulations, that the Foundation had a very strong interest in ensuring that agricultural land is not divided into parcels smaller than 50 acres.

In *Springlake,* we did not spell out the appellate court's role in reviewing a trial court's decision to declare a contract void as contrary to public policy. After we noted in that case that there was "no clear expression of intent on the part of the Board or the legislative committee" with respect to "the validity or enforceability of agreements made in violation of the regulation," 81 Md.App. at 704, 569 A.2d 715, we stated: "We are left, then, to consider the other appropriate factors." *Id.* In other words, we took it upon ourselves to conduct the balancing process *de novo.*

This appears to be consistent with the appellate procedure adopted by the Court of Appeals in *Md.-Nat'l Cap. P. & P. v. Wash. Nat'l Arena,* 282 Md. 588, 607, 386 A.2d 1216 (1978). In that case, after stating that "it is the function of a court to balance the public and private interests in securing enforcement of the disputed promise against those policies which would be advanced were the contractual term held invalid," the Court of Appeals indicated that it would conduct that balancing process itself, stating: "Armed with these fundamentals, we consider now the Arena's public policy contentions in the present appeal." *Id. See also Kreter v. HealthSTAR,* 172 Md.App. 243, 262–64, 914 A.2d 168 (2007).

Although Bowers has suggested that a more deferential standard of appellate review is appropriate, it is a moot point in this particular case because we would come to the same conclusion as the circuit court under either approach. We agree with the circuit court that the factors favoring enforcement are clearly outweighed by the public policy favoring preservation of large tracts of agricultural land. That public policy is best served by setting aside conveyances that are not approved in advance by the Foundation.

## IV.

After ruling on summary judgment that the deed conveying Lot 14 from Stitzel to Bowers should be declared void, the circuit court conducted a trial on Bowers's cross-claim against Stitzel. At the conclusion of the trial, the court rendered a

monetary judgment in favor of Bowers, and explained the components of compensation covered by the judgment: (1) return of the purchase price—$370,000; (2) settlement costs—$5,063.74; (3) repairs—$22,500.00; (4) real estate taxes—$5,591.12; (5) insurance premiums—$2,877.00; (6) maintenance expenses—$1,650.00; (7) property cleanup expenses—$3,300.00; (8) property line survey—$800.00; (9) prejudgment interest—$82,474.51; and (10) attorney's fees—$81,923.00. The court entered judgment in favor of Bowers against Stitzel "in the amount of $493,256.37 plus attorney's fees of $81,923.00." [3] In addition to the judgment against Stitzel, the court entered a judgment in favor of Bowers against Realty Title Company, Inc., in the amount of $124,256.37.

The only issue raised on appeal relative to the monetary judgment against Stitzel is Bowers's claim that the trial court erred in denying a request for interest on monies Bowers borrowed in reliance upon the contract to purchase Lot 14. Bowers asserted that they borrowed $400,000 to pay the acquisition costs and make repairs to the property. They claim that, "[a]s of the time of trial, they had incurred interest expenses in the amount of $94,718 on this borrowing." The trial court declined to grant this claim for relief, explaining:

[T]he principal dispute is whether the Bowerses may claim interest on the loans they borrowed from various financial institutions and the legal rate of interest at six percent on the purchase price. In my judgment, to allow recovery under both theories would be inappropriate because such a theory would effectively permit recovery of interest on seven hundred forty thousand dollars rather than three hundred seventy thousand dollars.... I believe the most equitable theory of recovery is by awarding six percent prejudgment interest on the liquidated claim of three hun-

---

**3.** The amount of the judgment for damages entered by the trial court is slightly in excess of the total of the components identified in the court's oral opinion. No issue has been raised on appeal with respect to that discrepancy.

dred seventy thousand dollars representing the purchase price.

We will not disturb the trial court's refusal to award additional interest as an element of damages in this case. Even though Bowers's cross-claim asserted legal theories of breach of contract and unjust enrichment, the underlying basis for awarding compensation to Bowers was the court's equitable ruling that the deed to Lot 14 be set aside. Under the circumstances of this case, the trial court did not err in basing its award of damages for interest upon its determination of "the most equitable theory of recovery."

**JUDGMENTS OF THE CIRCUIT COURT FOR WASHINGTON COUNTY AFFIRMED. COSTS TO BE PAID THREE-QUARTERS BY APPELLANT AND ONE-QUARTER BY CROSS-APPELLANTS.**